# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
April 22, 2003 Session

## RONNIE M. CAUTHERN v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40000059    Michael R. Jones, Judge**

---

**No. M2002-00929-CCA-R3-PD - Filed February 19, 2004**

---

The petitioner, Ronnie M. Cauthern, appeals the Montgomery County Circuit Court's denial of his petition for post-conviction relief. In 1988, the petitioner was convicted by a jury of two counts of felony murder and sentenced to death. He was also convicted of the related crimes of first degree burglary and aggravated rape. His convictions were affirmed on direct appeal by the Tennessee Supreme Court, but his death sentences were reversed and remanded for a new sentencing trial. Upon retrial before a jury in 1995, the petitioner received the death penalty for the murder of one victim and a sentence of life imprisonment for the second victim's murder. Those sentences were appealed and affirmed, following which the petitioner instituted a collateral proceeding seeking post-conviction relief from his convictions and sentences. Lengthy hearings were conducted on the petitioner's claims, the majority of which involved allegations that counsel representing him in his 1988 and 1995 trials rendered constitutionally ineffective assistance of counsel. On appeal, the petitioner contends (1) that trial counsel's services were deficient and prejudicial; (2) that the state suppressed exculpatory evidence in violation of his due process rights; (3) that the United States Supreme Court's opinions in *Apprendi v. New Jersey* and *Ring v. Arizona* require that his death sentence be set aside; (4) that he was entitled to but was not notified of his right to seek German consular assistance pursuant to the Vienna Convention on Consular Relations; (5) that the lower court erroneously concluded that some of his claims had been waived or previously determined; (6) that Tennessee's system of capital punishment is unconstitutional; and (7) that erroneous jury instructions impaired his right to a fair trial. After an extensive review of the record and consideration of applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOE G. RILEY and NORMA MCGEE OGLE, JJ., joined.

Donald E. Dawson, Post-Conviction Defender; and Paul J. Morrow, Deputy Post-Conviction Defender, for the Appellant, Ronnie M. Cauthern.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Jennifer L. Smith, Assistant Attorney General; Glenn Pruden, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Arthur F. Beiber, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

Before this court, the petitioner stands convicted of murdering Clarksville, Tennessee residents Patrick and Rosemary Smith. The petitioner received and is presently serving a sentence of life imprisonment for the felony murder of Patrick Smith. A jury imposed the death penalty as punishment for the petitioner's involvement in Rosemary Smith's homicide. The petitioner initiated and has pursued a collateral attack, in the form of a post-conviction petition, against his convictions and death sentence. The petition for relief was denied, and on this appeal, we are called upon to review the post-conviction court's findings and conclusions that led to the dismissal of the post-conviction petition.

Our appellate inquiry begins with an overview of the procedural and factual history of the case and moves to a summary of the post-conviction claims and the evidentiary hearings on those claims. Next, we examine the post-conviction court's rationale for its treatment of the petitioner's claims. Last, we evaluate whether the record and applicable law support the post-conviction court's rulings, mindful that different standards of appellate review attach to different aspects of the rulings.

## PROCEDURAL BACKGROUND

Following a 1988 jury trial, Ronnie M. Cauthern and Brett Patterson were convicted in Montgomery County of first degree burglary, aggravated rape, and two counts of felony murder for their involvement in a 1987 home invasion that occurred in Clarksville. At a separate penalty trial, the jury sentenced Patterson to life imprisonment, and the petitioner received the death penalty for both homicides. *State v. Cauthern*, 778 S.W.2d 39, 40 (Tenn. 1989), *cert. denied,* 495 U.S. 904, 110 S. Ct. 1922 (1990). On direct appeal, the Tennessee Supreme Court affirmed the petitioner's convictions but remanded to the trial court for a resentencing trial. *Id*. at 47-48.[1]

Because of pretrial publicity, venue was transferred to Gibson County. A jury selected from that county in 1995 sentenced the petitioner to life imprisonment for the murder of Mr. Smith and imposed the death penalty for the murder of Mrs. Smith, based on the "especially heinous, atrocious or cruel" nature of the murder. *See* Tenn. Code Ann. § 39-13-204(i)(5) (1991). The court

---

[1] At that time, by statute, death penalty cases were appealed directly to the Tennessee Supreme Court. *See* Tenn. Code Ann. § 39-13-206(a)(1) (1991) ("Whenever the death penalty is imposed for first degree murder . . . , the defendant shall have the right of direct appeal from the trial court to the Tennessee supreme court, which shall have exclusive appellate jurisdiction."). Since that time, the statute has been amended to provide for a direct appeal to the court of criminal appeals, with automatic review by the supreme court if the conviction and death sentence are affirmed by the intermediate appellate court. *Id*. § 39-13-206(a)(1) (2003).

of criminal appeals and the supreme court affirmed the sentence. *State v. Cauthern*, 967 S.W.2d 726 (Tenn. 1998); *State v. Ronnie Michael Cauthern*, No. 02C01-9506-CC-00164 (Tenn. Crim. App. Nashville, Dec. 2, 1996).

In 1999, the petitioner timely filed a *pro se* petition for post-conviction relief. The petition was filed in Montgomery County, but the case was transferred shortly thereafter to Gibson County, where counsel was appointed and a stay of execution was issued. Ultimately, pursuant to a joint motion of the state and the petitioner, the matter was reassigned to Montgomery County for consideration and disposition. A multi-day evidentiary hearing was conducted over a period of months, and the parties submitted written closing arguments in September 2001. On November 21, 2001, the post-conviction court issued an exhaustive, 63-page memorandum and order dismissing the petition.

## OVERVIEW OF 1988 TRIAL AND 1995 RESENTENCING TRIAL

We begin with a factual summary of the evidence from the jury trials leading to the petitioner's convictions and sentences for the murders of Patrick and Rosemary Smith. These facts are taken from and appear in the two earlier 1989 and 1998 supreme court opinions.

> The Smiths were both captains in the U.S. Army stationed at Fort Campbell Kentucky. . . . Both were nurses. When neither of them reported to their duty stations on the morning of 9 January 1987 and telephone calls to their home received no answer, two persons from the base went to their home, observed broken glass in the rear door, and both cars in the garage. A 911 call was made and the police arrived promptly and discovered the body of Patrick Smith lying face down on the bed in the master bedroom, facing 90 degrees counter clockwise from his sleeping position, and wrapped in the top sheet. He had been strangled to death, apparently with a length of 880 military cord. The bed was broken and tilted indicating a violent struggle had taken place.

*Cauthern*, 778 S.W.2d at 40.

> . . . The body of Rosemary Smith was discovered in another bedroom; her underclothes were next to her body and her nightgown was in the corner of the room. A scarf had been tied around her neck and knotted, with a small vase inserted between the nape of the neck and the knot, creating a tourniquet.

> . . . Credit cards, electronic gear and a videocassette recorder appeared to be missing from the house. Police found costume jewelry in the house, but no jewelry of value.

*Cauthern*, 967 S.W.2d at 730.

> The police found the telephone line had been cut near its entry into the outside wall of the house. A shoe print was found on the back door that matched Patterson's shoe. In a statement that he gave police he admitted kicking the back door once or twice, but said it would not open so they obtained a hammer and broke the pane of glass nearest the door knob to gain entry. The house was ransacked, chest of drawers open, luggage and clothing scattered about. In the master bedroom, the police found a piece of paper upon which was written defendant Cauthern's name, address and telephone number. Rosemary Smith's sister testified she was familiar with both her sister's and her brother-in-law's handwriting and the information about Cauthern was not written by either of them. The cumulative evidence [established] that defendant and the Smiths had been acquainted for approximately a year at the time of the murders, that he had performed some work on Patrick's Mercedes and perhaps some additional work at their home, although he said in one of his statements that he had never been inside their home until the evening of 8 January 1987.

*Cauthern*, 778 S.W.2d at 40.

> . . . James Phillip Andrew testified [at both trials] that he was with the defendant, Ronnie Cauthern, and Brett Patterson shortly after the offenses. While watching television, they all saw an account of the Smiths' murders in which a reward was offered for information. Cauthern told Andrew that he had worked for the Smiths in the past and that he broke into their home and made the woman get into the closet, while he and Patterson strangled the man. Cauthern told Andrew that he raped the woman once and that he had stolen a wedding ring, a VCR, and some credit cards. . . . .

> Joe Denning, Andrew's roommate, also testified that Ronnie Cauthern admitted his role in the killings. Cauthern told Denning that he had cut the telephone lines to the house, had broken in through the back door, had shined flashlights in the victims' faces in order to wake them, and had placed Rosemary Smith in a closet. He admitted to Denning that he had raped the woman and poured wine coolers over her, and then attempted to kill her. He said he tried to strangle the woman by tying a scarf around her neck, but did not have the strength to kill her, so he used the vase to create a tourniquet. . . .

-4-

Cauthern's former girlfriend, Jackie Pigue, testified that on Thursday night, January 8, 1987, Cauthern and Patterson were "solemn" and "quiet." The next day Cauthern gave her a watch and a wedding ring. He told her that someone owed him money and he was holding the items as collateral. When she later saw a news report regarding the murders and Cauthern's arrest, she went to the police and gave them the jewelry.

Cauthern and Patterson were arrested on January 12, 1987. Search warrants were obtained for Cauthern's car and Patterson's house. Among the items found were the victims' credit cards, identification cards, receipts, checks and two key rings containing keys which unlocked the Smiths' home and automobiles. The police also found two ski masks, several handguns, a roll of 880 military cord, and Patrick Smith's jacket.

Initially, Cauthern gave several statements to the police, all of which were admitted into evidence at the sentencing hearing. In the first statement, he denied knowing the Smiths or anything about the murders. In a later statement, which was recorded and transcribed, Cauthern admitted that he was in the Smiths' home, but denied that he had raped or murdered anyone. Claiming that he and Mrs. Smith were having an affair, he contended that she had called and invited him to come to the Smith house and enter through the back door. He said that both he and Patterson had consensual sex with Mrs. Smith, and he denied that he participated in the murders, raped the victim, or removed any items from the house.

[At the 1995 resentencing trial], Cauthern testified that he was nineteen years old at the time of the murders. He stated that he never knew his birth father and saw his birth mother approximately three times during his entire life. His birth mother died, and he was adopted by his maternal grandmother and step-grandfather who moved to Clarksville in 1973. The defendant attended Northeast High School, but dropped out to care for his grandmother who had Parkinson's disease, so that his step-grandfather could continue to work. He was married at the age of eighteen and at the time of the hearing, had an eight-year-old son. Although he had divorced his son's mother, he continued to see his son every three to five months. Since his incarceration he had remarried. His wife, who lived in Canada, was not at the hearing. He testified that he helps his parents by writing letters for them.

Cauthern also said he had completed the Graduate Equivalency Examination and a paralegal course since being incarcerated, and he serves as a teacher's aide to the unit prison teacher. He has achieved "A" status at Riverbend Maximum Security Institution for privilege purposes, which is the highest status available for a prisoner. He introduced letters of appreciation from a correctional officer and the prison teacher. A Unit Review Panel Hearing form containing positive comments concerning his behavior and attitude was also introduced. He makes extra money by drawing greeting cards and selling them to other prisoners. Charles Tracy, a teacher for the Department of Correction, testified that he chose Cauthern as a teacher's aide because he gets along well with others and has good communication skills.

*Cauthern*, 967 S.W.2d at 730-31 (footnote omitted).

In the course of our opinion, when necessary, we will set out in greater detail the evidence and testimony from the earlier trials.

## GROUNDS FOR RELIEF

On appeal, the petitioner pursues seven principal claims, with multiple sub-parts. The principal claims are:

- Trial counsel's performance was deficient and prejudicial;

- The state withheld an exculpatory police report and other information from trial counsel;

- The death sentence in this case violates the principles set forth in *Apprendi v. New Jersey* and *Ring v. Arizona*;

- The petitioner, who is a German national, was not notified of his right to German consular assistance and services in violation of the Vienna Convention on Consular Relations (VCCR);

- The post-conviction court erroneously ruled that some of the post-conviction claims had been waived or previously determined;

- The system of capital punishment in Tennessee is unconstitutional, and appellate counsel rendered ineffective assistance of counsel by failing to attack the petitioner's death sentence on this basis; and

-6-

- Erroneous jury instructions and trial counsel's failure to object thereto skewed the weighing of aggravating and mitigating factors, thereby obstructing the right to a fair trial and depriving the petitioner of effective assistance of counsel.

Many of these claims have interlocking themes and similar components.

## POST-CONVICTION EVIDENTIARY HEARINGS

At the post-conviction hearings, the petitioner presented testimony from twelve witnesses. Three family members, two family friends, and the petitioner's former wife testified about the petitioner's upbringing and social history. The two attorneys who had previously represented the petitioner recounted their investigative efforts, pretrial preparation, and trial strategy on the petitioner's behalf. Two former law enforcement officers testified to Brett Patterson's prior criminal history and his suspected involvement in the rape and strangulation death of a teenage female in Los Alamos, New Mexico. An expert in clinical and forensic psychiatry testified about his evaluation of the petitioner and the resulting diagnosis. Last, the Deputy Consul General to the German Consulate in Atlanta, Georgia testified as an expert on the subjects of German citizenship, the petitioner's genealogy that could qualify him for German citizenship, and the requirements of the Vienna Convention when a German national is arrested in the United States. In rebuttal to the petitioner's experts, the state presented testimony from a psychologist who had been retained by the prosecution to perform a forensic evaluation of the petitioner and from a senior counsel with a Washington, D.C. law firm whose practice focused on public and private international law. The petitioner did not testify in support of his bid for post-conviction relief.

### A. The Petitioner's Social History

The petitioner was born in Tennessee on September 5, 1967. His biological parents were Raymond Huhn, a German citizen, and Christine Tatteryn Huhn, a Canadian citizen. During Christine Huhn's pregnancy, Raymond Huhn was arrested for burglary and imprisoned in California. Needing a place to live, Christine Huhn contacted her mother-in-law, Dagmar Huhn Cauthern, who lived in Tennessee and who invited Christine Huhn to stay with the Cauthern family.

Dagmar Huhn's husband, Roy Cauthern, Sr., had served in the military during World War II. Evidently, while he was stationed in Germany, he met his future wife, a German citizen who ultimately became a casualty of the Allied bombings of that country. Little is known of Dagmar Huhn's life in Germany other than giving birth to one child, Raymond.[2] Many years after the surrender of Germany and Japan, Dagmar Huhn immigrated to the United States and renewed her acquaintance with Roy Cauthern, Sr. He had been recently widowed in 1962, and he was a single

---

[2] We find no suggestion in the record before us that Roy Cauthern could have been Raymond Huhn's biological father.

parent to four children: Melinda, Mary Louise, Eveann, and Roy Cauthern, Jr. In February of 1963, Dagmar Huhn and Roy Cauthern, Sr. were married.

Christine Huhn gave birth in 1967 to the petitioner while she was living with the Cautherns. When the petitioner was approximately six weeks old, Dagmar Cauthern prevailed upon Christine Huhn to return to California to divorce Raymond Huhn. When Christine Huhn left, Dagmar Cauthern then reported that Christine had abandoned her child, which allowed Dagmar and Roy Cauthern to officially adopt the petitioner. The petitioner first learned of his adopted status when he was a teenager and discovered his birth certificate.

By the time of the post-conviction hearings in 2000 and 2001, the petitioner's biological parents were deceased. His adoptive father, Roy Cauthern, died in 1997, and his adoptive mother/biological grandmother, Dagmar Cauthern, was suffering from Parkinson's Disease and living in a nursing home. His stepsister, Mary Louise, succumbed to leukemia in 1980, but the other step-siblings were alive.

The three remaining step-siblings, Melinda Cauthern Allen, Roy "Bud" Cauthern, Jr., and Eveann Cauthern Palmer, testified at the post-conviction hearings about their lives before and after their father's marriage to Dagmar Huhn. None of them had testified at the petitioner's earlier trials. Each sibling recalled an idyllic family life before the death of their mother, and their relationship with Dagmar Huhn initially was quite positive. When, however, Dagmar became their stepmother, she changed -- in Melinda Allen's words -- "[a]most overnight." By all accounts, Dagmar Cauthern abused the children physically and emotionally. The older children were the primary targets, but as the younger children matured, they also joined the ranks of the abused.

What follows is a summary of the Cauthern children's testimony. Suffice it to say that the parties, the parties' witnesses, and the post-conviction court are in agreement that the environment in the Cauthern household was defined by Dagmar Cauthern's behavior. From the post-conviction testimony, the primary disputed issues that arose were whether the petitioner received preferential treatment from Dagmar Cauthern in terms of the severity and duration of the abuse and whether the Cauthern children would have been available and willing to testify on the petitioner's behalf in 1988 or 1995.

Melinda Cauthern Allen testified that she was eleven years old when her mother died; Bud was ten years old; Mary Louise was six; and Eveann was five. According to Melinda Allen, her stepmother was very demanding. Dagmar Cauthern would scream and curse at the children when she was angry and would hit them when their father was not present. According to Melinda Allen, Dagmar Cauthern would randomly assign household chores to the children, and she would punish them if the chores were not performed to her satisfaction. Melinda Allen testified that Dagmar Cauthern would hit them with whatever objects were nearby, such as a broom, a belt, or a wooden spoon. The children were frightened of their stepmother, who at times would awaken them at night by hitting them or would hide behind the door and ambush them with a stick when they came home from school.

Melinda Allen related that birthdays were not celebrated in the Cauthern household, and the children were not allowed to invite friends to the house or to eat dinner with their father. Also, the children were permitted to bathe only once a week, so as not to foul the bathroom.

Melinda Allen was sixteen years old when the petitioner was born. She left home to join the Air Force approximately sixteen months later. At that time, Eveann and the petitioner were the youngest children, and Eveann seemed to be the favored or "privileged" child. When Melinda Allen occasionally returned home to visit, she noted that the petitioner appeared to have assumed Eveann's position as the privileged child, "the apple of [Dagmar's] eye."

Melinda Allen learned of the petitioner's arrest through an aunt who had seen a report on television. No one ever contacted her about the petitioner's original trial or resentencing trial. When asked whether she would have assisted and testified in the earlier proceedings had she been contacted, Melinda Allen responded, "I doubt it." She, likewise, stated that she would not have cooperated with any mental health professionals about the Cauthern family background. She explained her reluctance: "You see because it would hurt my daddy. I couldn't do anything to hurt him." Only if her brother or sisters had "properly approached" her with approval from their father would Melinda Allen have assisted.

Bud Cauthern's account of his childhood mirrored that of his older sister. He endured Dagmar Cauthern's beatings for significant and trivial misdeeds alike. He testified that his stepmother's favorite thing was "to haul off and slap you right in the face." Because of Dagmar Cauthern's obsession about hygiene, he often would urinate at night into a soda bottle and void his bowels outside. He witnessed physical assaults upon his sisters, while his father, who was "browbeat[en]" and verbally abused by Dagmar, remained a passive observer.

Bud Cauthern testified that he ran away from home when he was sixteen years old and enlisted into the military. The petitioner was approximately six months old when he left. Bud Cauthern served in Vietnam, where he was wounded, and he described his experience in that conflict as preferable to the treatment he received from Dagmar Cauthern.

Bud Cauthern also witnessed Eveann's transition from being the "golden child" of the family to joining the "slave labor force." When that happened, the petitioner assumed favored-child status. Later on, however, when the petitioner was in high school, he became the object of Dagmar Cauthern's abuse, which Bud Cauthern saw on his periodic visits with the family. According to Bud Cauthern, the relationship between the petitioner and Dagmar Cauthern "depend[ed] on which side of the bed she got up on in the morning." There were times when the petitioner "could do no wrong," and "other times he couldn't breathe to suit her."

Bud Cauthern learned of the petitioner's arrest from his sister, Melinda Allen. No one ever contacted him about the case or about the resentencing trial in 1995. Before he would have assisted with the petitioner's case, Bud Cauthern testified that he "would have talked to daddy first."

If his father wanted him to help the petitioner, he would have done so; otherwise, "if it would have bothered daddy or hurt him [he] probably wouldn't have done it."

Eveann Palmer was in Germany with her husband, who was stationed there in the military, when she learned that the petitioner had been arrested for murder. She testified that she believed her father was the one who contacted her. Eveann Palmer called from Germany and spoke with the petitioner's attorney. Her recollection was that the attorney never asked her for help and never inquired about family background information.

Eveann Palmer was not aware of the petitioner's resentencing trial in 1995. She still maintained contact with her sisters and brother at that time, and the petitioner's attorney certainly could have located her if her assistance had been needed. Eveann Palmer testified that she would have spoken to and tried to assist the petitioner's counsel had she been approached in 1988 or 1995. In addition, she maintained that she would have testified at those times had she been asked.

Eveann Palmer was five years old when her father married Dagmar Huhn. Eveann Palmer was the youngest child, and she recalled being treated very well until she was approximately ten years old. The petitioner was born at that time, and the abuse started. Even before Eveann Palmer became the target of abuse, she testified that she saw how her stepmother acted and what her stepmother was capable of doing. She recalled that one of Dagmar Cauthern's favorite punishments was to make the children stand in a corner for hours. Like the other children, Eveann Palmer remembered being slapped in the face and waking up as Dagmar Cauthern was beating her. At one point, Dagmar Cauthern chased after Eveann and her sister, Mary Louise, with a gun threatening to kill them.

Eveann Palmer left the family and joined the army when she was eighteen years old. The petitioner was eight years old when she left, and at that point, Eveann Palmer said that the petitioner was still regarded as the favorite child. When, however, Eveann Palmer returned to visit the family from time to time, she noticed that Dagmar Cauthern had begun treating the petitioner as she had the other children.

Eveann Palmer testified that neither Melinda nor Bud received the "golden child" treatment. For a time, Eveann and the petitioner were "golden children." Even so, Eveann Palmer explained that "you're living with guilt, because you see what your brothers and sisters are going through and you also deal with that guilt."

In addition to his step siblings, the petitioner called his former wife and two neighbors to testify about the Cauthern household. By the time the neighbors, William and Brigitte Pope, met the Cautherns, Dagmar Cauthern was confined to a wheelchair with Parkinson's Disease. Mr. Pope was a Sergeant First Class at Ft. Campbell, and Roy Cauthern spent most of his time working at an automotive facility on the military base known as the Hobby Shop. Mr. Pope recalled that Roy Cauthern would transport Dagmar in an RV to the Hobby Shop where he could watch over her and make sure that she was fed and received her medicine. Mr. Pope also recalled that the petitioner

often would come to the Hobby Shop with Roy Cauthern. To Mr. Pope, the petitioner always seemed happy to build and fix things; Mr. Pope also described the petitioner as "starving for attention."

In discussing Dagmar Cauthern, both Mr. and Mrs. Pope painted an unflattering picture of a demanding, unpleasant, and mean-spirited individual. Dagmar Cauthern often complained to the Popes that her husband mistreated her, did not feed her, and beat her. The Popes never saw any evidence to substantiate these allegations, and they got to the point that they could not believe anything that Dagmar Cauthern said. Mr. Pope affirmed that he "definitely" would have testified for the petitioner had he been contacted either in 1988 or 1995.

The petitioner's former spouse, Lucinda Miracle, chronicled her experiences with her in-laws while married to the petitioner. Ms. Miracle testified that she and the petitioner were married for approximately fourteen months, from December 1985 to February 1987. Their one child, a boy, was fourteen years old at the time of the post-conviction hearing. During the marriage, Ms. Miracle and the petitioner lived occasionally with Roy and Dagmar Cauthern.

Ms. Miracle testified that some days Dagmar loved her a lot, while other days Dagmar could not "stand the sight" of her. The petitioner received the same treatment, and Dagmar seemed to yell at him constantly. By that time, Dagmar's Parkinson's Disease had progressed such that she was periodically in a wheelchair. Ms. Miracle said that the Cautherns wanted her and the petitioner living with them to have someone to take care of them. Ms. Miracle related that even after the petitioner was incarcerated, she maintained a relationship with the Cautherns so they could see the grandchild. Once, when the boy was eight years old, he called Ms. Miracle crying and asking for her to come get him because he had spilled something and Dagmar was being mean to him.

Ms. Miracle testified about her "up and down" relationship with the petitioner. She related that the petitioner had trouble being close to people and that he would often disappear for weeks with friends. She said that the petitioner "really looked for the acceptance from other men," and she described him as a "follower." She also said that he had been unfaithful during their marriage.

During Ms. Miracle's pregnancy, she and the petitioner were living with the Cautherns. She testified that the petitioner discovered paperwork in Dagmar's pocketbook proving that the Cautherns were not his biological parents. Ms. Miracle said that the petitioner was upset and felt as if his life had been a lie. A few months before the Smiths' homicides, the petitioner met Christine, his biological mother. Their reunion, however, was short lived; she had terminal cancer and died within a few weeks.

Ms. Miracle remembered that she was introduced at one point to the petitioner's attorney, but he never asked her any questions. Had the attorney requested information about the petitioner's background, Ms. Miracle testified that "absolutely" she would have cooperated and would have testified in 1988 or 1995.

-11-

## B. Post-Conviction Psychological Evaluations

The post-conviction proceedings in this case featured two classic "battles of the experts." We begin with the clash between Dr. Keith Caruso and Dr. John Spencer.

The record shows that prior to his 1988 trial and at the request of the defense, the petitioner underwent a forensic evaluation to determine his competency to stand trial and his sanity at the time of the offense. That evaluation resulted in a conclusion that he was competent and sane. Post-conviction counsel arranged for a broader forensic evaluation of the petitioner by Dr. Caruso, and the state was permitted to have its own expert, Dr. Spencer, evaluate the petitioner. Doctor Caruso was accepted by the post-conviction court as an expert in clinical and forensic psychiatry, and Dr. Spencer was qualified as an expert in psychology.

From Dr. Caruso's examination of the petitioner and his investigation and review of other sources, he made multiple diagnoses of the petitioner, including antisocial personality disorder, borderline personality disorder, post-traumatic stress disorder, polysubstance abuse, hallucinogen intoxication, history of closed head injury, multiple psychosocial stressors, and ongoing legal stressors. Doctor Caruso testified that the petitioner suffered from post-traumatic stress disorder as a result of witnessing and experiencing physical and emotional abuse by Dagmar Cauthern. Doctor Caruso's diagnosis of polysubstance abuse at the time of the offense was based on the petitioner's report that he abused Vivarin and LSD, as well as alcohol and marijuana. Doctor Caruso admitted that it was "very difficult" to build a rapport with the petitioner, and it took some time before Dr. Caruso believed that he was getting accurate information from the petitioner. Doctor Caruso also admitted that the petitioner had a history of deceitfulness.

Doctor Caruso explained his diagnosis of borderline personality disorder with narcissistic features as a condition characterized by an unstable sense of self, interpersonal relationships, and emotional states and by difficulty controlling anger or impulses. He further explained the diagnosis of antisocial personality disorder as resulting from a failure to conform to social norms of lawful behavior. In his opinion, the petitioner was also suffering from psychosocial stressors at the time of offense, including marital problems, a sense of abandonment by his biological parents, and a sense of betrayal when his status of favored child changed to that of abused victim.

As for the petitioner's view of the rape of Rosemary Smith, Dr. Caruso testified that it was about rage and not sexual gratification. From what the petitioner had related, Dr. Caruso testified that he believed that the petitioner was struggling with Mrs. Smith, and he fell at the top of the stairs. Something about smelling the carpet and falling at the top of the stairs reminded the petitioner of an occasion, as a child, when he fell over a vacuum cleaner and Dagmar Cauthern beat him. Doctor Caruso also believed that there were other associational similarities between Mrs. Smith and Dagmar Cauthern that triggered the petitioner's violent behavior. Even so, Dr. Caruso did not think that the petitioner was insane at the time of the attacks: "[T]here may have been a lot of emotional baggage that was tied to it, and may have been symbolically . . . someone else, but I

think ultimately there is no evidence of insanity or the inability to form the intent to commit that particular act."

In terms of what kind of penalty mitigation evidence could have been developed and presented on the petitioner's behalf in his earlier trials, Dr. Caruso testified that he found multiple statutory and non-statutory mitigating circumstances. First, the petitioner was suffering from extreme mental or emotional disturbance at the time the crimes were committed. Second, the petitioner acted under the substantial domination of his co-defendant, Patterson. Third, the petitioner was only nineteen years old and extremely immature at the time of the offenses. Fourth, the petitioner's capacity to appreciate the wrongfulness of his conduct or to conform it to the requirements of the law was substantially impaired by his post-traumatic stress disorder and hallucinogen intoxication. Fifth, the petitioner has a family history suggesting that he has a genetic predisposition to impulsive behavior. Sixth, the petitioner has a history of closed head trauma, which has been linked to reduced impulse control and impulsive violence. Seventh, the petitioner's history of physical and emotional abuse and neglect was severe enough to lead to borderline personality with narcissistic features and antisocial personality disorder, which are markers for severely impaired coping ability.

Doctor Caruso concluded that the petitioner's post-traumatic stress disorder is treatable by medication and psychotherapy. To Dr. Caruso, the petitioner also seemed to be more stable in a prison setting than in his earlier life because of the structured environment of a correctional facility.

Not surprisingly, Dr. Spencer disagreed with nearly every conclusion and diagnosis reached by Dr. Caruso. From his review of documents and witness statements and based on interviewing the petitioner, Dr. Spencer did not believe that the petitioner was acting under extreme mental or emotional disturbance at the time of the offense. Nor did Dr. Spencer see any indications to suggest that the petitioner was under the "substantial" domination of another person at the time of the offense. Doctor Spencer based these opinions, *inter alia*, on the crime scene video and his interview with the petitioner. He testified that the petitioner exhibited very "goal directed" behavior at the time of the offense, including wearing a mask, carrying a firearm to the scene of the crime, cutting the telephone lines to the house, and making a forced entry into the residence. Doctor Spencer analogized the attacks as similar to a "military operation," and he saw no evidence that Patterson was trying to control the petitioner.

Overall, Dr. Spencer testified that his evaluation detected no mental retardation or disease. The petitioner, to Dr. Spencer, appeared "well organized," "articulate," "engaging," and "socially skillful." Doctor Spencer was firm that he saw no evidence suggesting, as Dr. Caruso had, that the killing of the Smiths was a symbolic killing of Dagmar Cauthern to the petitioner. The petitioner denied to Dr. Spencer making any such association at the time. Also significant to Dr. Spencer was that among the children, the petitioner was a "favored child." Doctor Spencer reasoned that the petitioner's abuse did not start until he was older and that the other children, who were treated far worse, seemed to have turned out okay for the most part. Doctor Spencer testified that

he had no reason to believe that the step-siblings' description of the Cauthern household was incorrect or untruthful. The bulk of the information, he said, indicated that Dagmar Cauthern was "an unpleasant, angry, controlling, vindictive woman."

### C. Testimony of Former Trial Counsel

For the Montgomery County trial in 1988, one attorney was appointed to represent the petitioner, although two attorneys were assigned to Brett Patterson's defense. The petitioner's attorney evidently never requested that co-counsel be appointed to assist him in defending against the dual homicide charges for which the state was seeking the death penalty.

Trial counsel testified that he began practicing law in 1973. Prior to his appointment to represent the petitioner, trial counsel had not been involved in any death penalty cases and had not attended any death penalty seminars. Counsel attested that at the time of the petitioner's trial, he was aware that procedures existed to seek support services in death penalty cases. The only expert assistance that counsel sought prior to trial, however, was a psychological evaluation limited to determining competency to stand trial and sanity at the time of the offenses. No other mental health examination was ever performed. As for other support services that could have been, but were not, requested, trial counsel explained, "The other matters, I felt comfortable that I investigated them myself. As far as experts go in any other these other areas, I guess in my judgment I didn't think I needed them."

Regarding the petitioner's social history and family background, trial counsel testified that he relied on information from Roy and Dagmar Cauthern. Trial counsel admitted that he never tried to contact any of the petitioner's step-siblings, but he believed that he spoke with the petitioner's former wife and father-in-law, both of whom attended the trial. Trial counsel also never sought any birth, adoption, juvenile, or school records and never had the petitioner sign releases for any such information. Counsel said that he was aware that the petitioner was adopted, and counsel learned from Dagmar Cauthern that the petitioner's biological father was incarcerated. As for the petitioner's biological mother, trial counsel knew only that her name was Christine. Counsel was unaware that she was a Canadian citizen. Counsel neither sought records about the biological parents, nor did he investigate Damgar Cauthern's German background, which was obvious from her accent.

Trial counsel's knowledge of Patterson's background was even sketchier. Counsel said that all he knew about Patterson before trial was that he had been in the military. Counsel did not learn until the trial was underway that Patterson had been suspected of murder in New Mexico; counsel learned that information during a break in the trial proceedings from a conversation with a New Mexico law enforcement officer who was attending the trial. At the post-conviction hearing, trial counsel was shown records from the prosecution's files containing information about the New Mexico investigation and Patterson's criminal history. Counsel testified that those records were never provided to him. Similarly, trial counsel was shown a police report from the prosecution's

files containing information that could have been used to impeach witness James Andrew; that report, according to counsel, had not been disclosed to him.

Trial counsel was asked to describe the theory of defense and to explain why he did not seek a severance from co-defendant Patterson. Trial counsel testified that the theory was to "throw as much onto Patterson as possible." Going to trial with Patterson, trial counsel believed, would reduce the petitioner's chances of being convicted and receiving the death penalty. Trial counsel viewed Patterson as more culpable and wanted the jury to be able to compare Patterson's age and larger size with the petitioner's relative youth. Counsel was asked and admitted that psychological support services "[p]robably" would have helpful in pursing that defense strategy.

Trial counsel testified that at the first sentencing trial, the petitioner did well on direct examination but "crumbled on cross" examination. At the 1995 resentencing trial, trial counsel's strategy was to portray the petitioner in the most favorable light possible in terms of showing how he had matured and become a better person since he had been incarcerated. Trial counsel did not, however, object to the prosecution's repeated characterization, in closing argument, of the petitioner as the "evil one." Trial counsel claimed that he did not want to draw unnecessary attention to the "rather obnoxious argument" and that, at any rate, the Tennessee Supreme Court found the argument to be harmless.

As with the first trial, counsel did not seek any support services for the resentencing trial. His explanation was that he "had talked to Ronnie [Cauthern] many times before that," and he "just felt like nothing else in [his] judgment was needed in that regard." As for Roy and Damgar Cauthern, trial counsel described the adoptive parents as very "guarded" in providing information about the biological parents. For the resentencing trial, trial counsel did solicit the services of another attorney to help him with the trial. The first attorney who agreed to serve as co-counsel, however, had to withdraw after accepting employment with the district attorney general's office. A second attorney, who agreed to help, was not appointed until mid-November 1994, approximately two months before the sentencing retrial. Trial counsel testified that he directed co-counsel to read the record and offer any suggestions or ideas on how to approach the resentencing trial.

Co-counsel had been practicing law approximately four years when he became involved in the petitioner's resentencing. Co-counsel testified that he began working on the case on November 15, 1994, and that trial commenced on January 24, 1995. Co-counsel described himself as "second chair" on the case, having no experience in defending capital cases. He said that he spent considerable time reviewing the transcripts from the first trial, but otherwise his involvement in pretrial preparation was limited. Based on his time records, co-counsel testified that he spoke with the petitioner three times and that he interviewed one witness.

Co-counsel was asked about expert services and psychological evaluations. He testified that he knew that procedures existed to secure funds for expert assistance in death penalty cases but that no assistance was sought for the 1995 resentencing trial. Furthermore, he testified that he was aware that there had been some earlier psychological examination of the petitioner. Co-

counsel was not familiar with any specifics, but he stated that he was under the impression that the results of that examination were unfavorable.

The defense theory at resentencing, according to co-counsel, was to present Patterson as being more culpable even though the previous jury had returned life sentences for Patterson's involvement in the homicides. At the same time, the defense wanted to emphasize favorable aspects of the petitioner's life both prior to and following the homicides. The defense, however, wanted to avoid having the petitioner testify because he could be cross-examined about damaging testimony he had given at the first trial. The defense also wanted to avoid calling Patterson as a witness because he was an "unknown," and they did not know what he might say on the stand.

### D. Testimony of New Mexico Law Enforcement Officers

Gregory Talley testified at the post-conviction hearing that he previously served as Deputy Police Chief of the Los Alamos Police Department in New Mexico. While with the police department, Deputy Chief Talley became familiar with Brett Patterson. According to Deputy Chief Talley, Patterson was the primary suspect in the 1981 strangulation death of a teenager in Los Alamos. The teenager was discovered in her bedroom, and the autopsy indicated possible anal penetration. Deputy Chief Talley testified that the case was still open but admitted that Patterson had never been charged for the murder. Deputy Chief Talley further testified that he was never contacted by anyone representing the petitioner, but he would have been willing to testify if requested. Deputy Chief Talley described Patterson as a "wannabe" cowboy and manipulative.

Alan Kirk served as the Los Alamos County Police Chief from 1988 to 1998. He testified that Patterson first came to his attention because of traffic violations. Kirk related that Patterson did not seem to be accepted by his peers and that Patterson would drive around the community looking for people with whom to associate. Kirk was personally involved in the investigation of the teenage girl's murder in 1981. Kirk stated that Patterson and the murdered girl's brother "hung out" together and that Patterson was a suspect in the unsolved murder. Kirk testified that the petitioner's attorney never interviewed him but that he once met with the petitioner's lead counsel because Kirk wanted to interview the petitioner to determine if he had any useful information about Patterson.

### E. The Vienna Convention on Consular Rights

The second battle of the experts in this case featured Bernd Kuebart, who testified for the petitioner, and Brice Clagett, who testified for the state. The credentials of both men are impressive and impeccable.

At the time of his testimony, Mr. Kuebart lived in Atlanta, Georgia and was posted with the German Consulate General. Mr. Kuebart's official title was Deputy Consul General, and he appeared at the post-conviction proceedings with the permission of the German government. Mr. Kuebart explained that he was authorized to testify about German law relative to citizenship, the

details of the petitioner's genealogy, Germany's position on the death penalty, and about the consular procedures followed when a German citizen is arrested in the United States. Regarding his qualifications, Mr. Kuebart related that he is an attorney and has specialized in International Law and European Law. He had been posted by the German government to numerous places in the world, and he once was posted with the German Delegation to the Commission on Human Rights. Mr. Kuebart testified that he had dealt with the Vienna Convention on a regular basis through his postings in Tehran and Atlanta.

According to Mr. Kuebart, when a German citizen is arrested in United States, the Vienna Convention requires that the person be notified by the arresting authorities of the right to contact his or her consulate or embassy. If the individual wishes contact, the arresting authorities are required to inform the consulate or embassy that an arrest has been made. Mr. Kuebart testified that at that point, the Consul General will contact the arrested person and undertake to determine whether the attorney on the case is adequately qualified or whether a more qualified attorney is required to properly defend the arrested individual. Mr. Kuebart identified death penalty cases as causing the greatest concern, and additional procedures are followed in those cases, including allocating funds for attorney fees and necessary investigative services. Mr. Kuebart stated that the same services would be offered to dual citizens provided the individual had German citizenship.

From the records that he had reviewed, Mr. Kuebart believed that there was a high degree of probability that the petitioner was a German citizen. For citizenship purposes, German law examines decendency. Mr. Kuebart testified that it appeared that Dagmar Huhn was a German citizen, having been born in Niedershschmalkaldem, in central Germany, and that she gave birth to Raymond Huhn (the petitioner's biological father) without benefit of marriage. Mr. Kuebart explained that for a child born out of wedlock, citizenship is conferred through the mother, thus bestowing German citizenship on the petitioner's biological father. On the other hand, children born of a marriage receive citizenship through the father. It appeared to Mr. Kuebart that because the petitioner's biological parents were married, the petitioner had the status of a German citizen. Mr. Kubert admitted that nothing about the petitioner's physical appearance indicated German citizenship, and no evidence had been uncovered suggesting that the petitioner had any direct connection with Germany.

Mr. Kuebart further conceded that the death penalty is not presently contrary to customary international law. As for the Vienna Convention, Mr. Kuebart admitted that the United States State Department does not agree with Germany's interpretation of the Vienna Convention as conferring individual rights to the person arrested; that dispute is presently pending before the International Court of Justice.

Brice Clagett testified for the state as an expert in international law. He is senior counsel with the law firm of Covington and Burling in Washington, D.C. and practices mostly in the areas of public and private international law. Mr. Clagett first addressed the death penalty in the international community, and he agreed with Mr. Kuebart that the death penalty is not unlawful under customary international law.

Mr. Clagett testified that dual nationality or citizenship has a rocky history. The United States State Department takes the position that a person who is a citizen of the United States and another country may be treated exclusively as a United States citizen, such that consular notification is not required if the detainee is a United States citizen. According to Mr. Clagett, the United States notified Germany of its position in 1998. Mr. Clagett said that the United States Supreme Court regards a position taken by the State Department with "great respect" but not as determinative. Furthermore, Mr. Clagett testified that in his opinion, pursuant to the Vienna Convention, an individual defendant does not have standing to litigate the consular notification provision.

After Messrs. Kuebart and Clagett testified, but while the post-conviction hearing was underway, the German Consulate issued original citizenship documents verifying that the petitioner is a German citizen. Copies of the documents were offered and received as exhibits to the hearing.

At the conclusion of the evidentiary hearings, the post-conviction court requested that the parties submit written arguments summarizing their respective positions. The post-conviction court reviewed the filings and issued an Order Dismissing Post-Conviction Petition on November 21, 2001.

## POST-CONVICTION COURT'S FINDINGS AND CONCLUSIONS

The post-conviction court began its analysis with the petitioner's ineffective assistance of counsel claim related to the guilt phase of his original trial in 1988. The court accredited the evidence that trial counsel chose not to enlist co-counsel or an investigator and did not attend any death penalty seminars or seek guidance from available capital case resource centers. Nonetheless, the court found that the petitioner had failed to demonstrate how such assistance would have benefitted the defense.

With regard to more specific complaints about trial counsel's representation, the post-conviction court characterized the proof as "often brief and unhelpful." For example, the petitioner had complained about the jury selection process and trial counsel's failure to request the services of a jury consultant. Citing the lack of proof on these issues, the court held that the petitioner had not carried his clear-and-convincing-evidence burden. Likewise, the court found that scant evidence had been offered supporting the claims that trial counsel did not adequately communicate with the client and did not adequately advise the petitioner about his right to testify. In view of trial counsel's time sheets and the petitioner's failure to testify during the post-conviction proceedings, the court found no basis to credit those claims.

One of the recurrent themes of the post-conviction proceedings was the alleged unmet need for a mental health expert to assist the defense. The post-conviction court pointed out that prior to the 1988 trial, the petitioner was evaluated for competency to stand trial and sanity at the time of the offenses. Inasmuch as Dr. Caruso also opined that the petitioner was competent and sane, the post-conviction court surmised that, in connection with the guilt phase of the 1988 trial, expert

-18-

mental health testimony could not have supplied a diminished-capacity defense. Furthermore, the post-conviction court ruled that the petitioner had not shown that he or his family members would have cooperated with a mental health expert in preparation for the 1988 trial.

The post-conviction court did agree, in part, with one of the petitioner's complaints about counsel's effectiveness during the 1988 trial. The court found that counsel's services were deficient for failing to timely file a new trial motion following the 1988 trial. Even so, the court ruled that the petitioner had failed to demonstrate prejudice in terms of meritorious issues having been waived by counsel's inaction. The court pointed out that despite counsel's lapse, the supreme court had ordered a new sentencing hearing for the petitioner and that Patterson had unsuccessfully raised many issues, also applicable to the petitioner, on direct appeal.[3]

The post-conviction court next turned its attention to the petitioner's ineffective assistance of counsel claim related to the 1995 resentencing trial. In its order denying post-conviction relief, the court indicated that it had canvassed the transcripts of the 1995 proceedings. From that review, the court related numerous examples showing that counsel had aggressively and competently represented the petitioner's interests. The court regarded co-counsel's official appointment immediately prior to trial as insignificant because co-counsel had been already involved in the case for two months preceding the trial.

The post-conviction court also highlighted counsel's and co-counsel's effectiveness in terms of their efforts to minimize culpability, *inter alia*, by showing the jury that the petitioner suffered from drug and/or alcohol intoxication at the time of the murders, by advancing the defense theory that the petitioner was an unwilling participant in Patterson's scheme without ever subjecting the petitioner to cross-examination, by convincing the court to permit questioning of witness Joseph Denning about admissions of responsibility that Patterson made, and by persuading the court to inform the jury that Patterson did not receive the death penalty for his involvement in the murders.

The post-conviction court took into consideration that counsel focused on the positive and negative aspects of the petitioner's life, before and after the homicides. The jury learned that the petitioner never met his biological father, saw his biological mother only on three occasions, and that he did not discover that he was adopted until he was fifteen or sixteen years old. Counsel presented evidence that the petitioner never graduated from high school, having dropped out in his sophomore year to help care for his adoptive mother who suffered from Parkinson's Disease. When he was eighteen years old, the petitioner married and later fathered a son with whom he maintained a relationship, despite divorce. The jury also learned that while imprisoned, the petitioner had excellent attitude and behavior reports, was tutoring other inmates, and had earned his Graduate

---

[3] The petitioner has abandoned on appeal many of his original allegations of counsel's ineffectiveness in connection with his 1988 trial. Except as otherwise noted and discussed in this opinion, we decline to engage in any protracted analysis of counsel's performance at the petitioner's original trial. We agree with the post-conviction court that much of the petitioner's proof directed at the 1988 trial was "often brief and unhelpful."

Equivalency Diploma. From the evidence, the jury was persuaded that the petitioner did not deserve the death penalty for Mr. Smith's death.

Because much of the petitioner's evidence addressed his social history, the post-conviction court dealt separately with the claim that counsel failed to adequately investigate the petitioner's background and present mitigation proof during the 1995 resentencing trial. Although crediting the testimony describing life in Roy and Dagmar Cauthern's household, the court rejected the claim for nine reasons, many of which relate to the petitioner's failure to testify during the post-conviction proceedings and the corresponding failure of proof.

(1)     Relying on the petitioner's own account of his childhood was not professionally unreasonable, particularly because no evidence suggested that Roy or Dagmar Cauthern ever gave trial counsel any reason to suspect that he "endured a difficult or abusive childhood";

(2)     Even if further investigation was warranted, the post-conviction court was "convinced that [the] petitioner and many of his post-conviction witnesses would have declined to testify and/or speak with a mental health expert about the alleged abuse";

(3)     Because of the close relationship between the petitioner and his adoptive father, the court did not believe that the petitioner would have conveyed to a mental health expert any information that reflected negatively on either adoptive parent;

(4)     Because the petitioner had given multiple conflicting accounts of the Smiths' murders and even gave inconsistent accounts to Drs. Caruso and Spencer, the court was not convinced that anything the petitioner would have shared with a mental health expert in 1988 or 1995 would have been consistent with the latest account conveyed to Dr. Caruso;

(5)     Even if the petitioner had spoken with a mental health expert and his lay witnesses had been interviewed and prepared to testify, the court found it "unlikely that [the] petitioner would have permitted [trial counsel] to present the lay or expert testimony to the jury";

(6) Compared with his siblings' abusive upbringing, the petitioner led a "charmed life," thereby making lay witness testimony less, not more, helpful;

(7) The version of events that the petitioner related to Dr. Caruso and Dr. Caruso's interpretation of those events are inconsistent with every other account that the petitioner has given and with the crime-scene evidence, and the state could have effectively cross-examined Dr. Caruso about the inconsistencies and undermined the defense mitigation strategy;

(8) Had Dr. Caruso testified during the 1995 resentencing trial, his testimony "would have angered the jurors and diminished the effectiveness of other mitigation proof" that trial counsel presented; and

(9) The vivid and disturbing circumstances under which Mrs. Smith was raped and murdered strongly supported application of the especially heinous, atrocious, or cruel aggravating factor, and that aggravating factor greatly outweighed the mitigation evidence that the petitioner criticizes trial counsel for not presenting.

The post-conviction court also addressed separately the complaint that trial counsel failed to object to the state's closing argument at the resentencing trial. The court declined to "second-guess" counsel's decision, which according to counsel's testimony was a tactical decision. Even, however, if it was objectively unreasonable not to object, the post-conviction court observed that the Tennessee Supreme Court had previously found the state's argument to be improper but not sufficient to warrant a new trial.

The next major issue that the post-conviction court addressed involved the Vienna Convention on Consular Relations (VCCR). Insofar as the petitioner was claiming ineffective assistance based on trial counsel's failure to research the petitioner's genealogy and failure to assert that his rights under the VCCR had been violated, the post-conviction court concluded that neither deficient performance nor prejudice had been proven. The court found that counsel's assumption that the petitioner was a United States citizen was reasonable because nothing about the petitioner's appearance or speech suggested that he might be a foreign national. Additionally, the court observed that no proof had been offered to show that a competent attorney should have been aware of the VCCR at the time of the petitioner's 1988 trial and/or 1995 resentencing.

From the prejudice standpoint, the post-conviction court pointed out the lack of evidence that the State Department would have taken the position that the VCCR afforded a dual

national any protections or rights. The court also reasoned that even if counsel should have ignored the State Department's position and contacted the German Consulate, the evidence offered at the post-conviction hearing did not establish what, in his case, Germany would have offered to do or, for that matter, whether the petitioner would have accepted Germany's assistance if offered.

For many similar reasons, the post-conviction court dismissed the petitioner's argument that the state independently violated his rights under the VCCR. From the evidence, the most favorable conclusion that the court said it could reach was that the petitioner was a dual national, in which case the notification requirements of the VCCR do not apply, according to the State Department. Additionally, the post-conviction court expressed the opinion that any protections under the VCCR are not constitutional in nature and that, at any rate, the petitioner had waived the issue.

As part of his bid for post-conviction relief, the petitioner had asserted that his convictions and sentences violate a multitude of international agreements and declarations, including the Universal Declaration of Human Rights, the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, the American Convention on Human Rights, the International Covenant on Civil and Political Rights, the American Declaration of the Rights and Duties of Man, the International Covenant on Economic, Social and Cultural Rights, the International Convention on the Elimination of All Forms of Racial Discrimination, and the Convention on the Elimination of All Forms of Discrimination Against Women. The post-conviction court dismissed the issue as not appropriate for post-conviction relief, as having been waived, as contrary to Mr. Clagett's testimony regarding international law, and as lacking factual support in this particular case. As for the companion issue of counsel's ineffectiveness in failing to raise the alleged international rights violations, the post-conviction court stated that the record did not establish deficient performance or prejudice.

The next issue that the post-conviction court discussed at length centered on James Andrew, who knew the petitioner and Patterson and who testified at the petitioner's 1988 and 1995 trials about inculpatory statements the petitioner made concerning the roles that he and Patterson played in the Smiths' murders. The petitioner advanced two post-conviction claims. The first claim was that trial counsel did not adequately impeach Andrew, thereby depriving the petitioner of the effective assistance of counsel. The second claim was that the state had withheld exculpatory information and a police report that could have been used to impeach Andrew's testimony.

On the first claim, the post-conviction court found that counsel's handling of Andrew's testimony was primarily a trial tactic, not to be second-guessed. More fundamentally, however, the court concluded "without hesitation that [the] petitioner suffered no prejudice." In the court's estimation, the petitioner's guilt was "overwhelming during the 1988 trial[,] and the sentence imposed during the 1995 trial was strongly supported by the record even in the absence of Andrew's testimony."

On the second claim, which alleged a due process violation, the post-conviction court found that the state had withheld from the defense a police report and information regarding Andrew's compensation or expectation of additional compensation. Nonetheless, the court concluded that the information was not "material" in the strict sense required to establish a *Brady* violation. In reaching this conclusion, the court separately considered the materiality of the information as it related to the guilt portion of the petitioner's trial in 1988 and the 1995 resentencing trial.

In seeking post-conviction relief, the petitioner also initiated a three-fold attack on the way that his trial counsel dealt with co-defendant Patterson. The petitioner complained that his attorneys were ineffective in failing to seek a severance from Patterson when the murders were tried in 1988 and in failing to use information, during the 1988 and 1995 trials, that Patterson was a suspect in a New Mexico homicide. The petitioner further complained about the disparity between the two life sentences that Patterson received and the death penalty that the petitioner received for Mrs. Smith's homicide.

The post-conviction court credited trial counsel's testimony that the decision not to seek a severance was a strategic one, and it declined to second-guess that strategy. At any rate, the court concluded that the petitioner had failed to prove the requisite prejudice from being tried jointly with Patterson. Concerning Patterson's suspected involvement in an unrelated homicide in another state, the post-conviction court was not convinced that trial counsel's investigation was inadequate, but even if it was, the unrelated homicide suspicions would not have been admissible. The outcome of the 1988 and 1995 trials, moreover, would not have been affected in the court's estimation, given the overwhelming evidence of the petitioner's guilt and other similar evidence, including Denning's cross-examination testimony at resentencing, that Patterson told Denning that Patterson was responsible for killing both victims. The court analyzed the sentencing-disparity complaint from a factual standpoint and found it lacking.

The remaining issues that the post-conviction court identified and analyzed were counsel's alleged ineffectiveness in failing to attack Tennessee's method for conducting a proportionality review of death-sentenced defendants, counsel's failure to challenge the constitutionality of Tennessee's death penalty scheme, the adequacy of the jury instructions from the 1988 and 1995 trials and counsel's performance related thereto, and the cumulative effect of any errors. The post-conviction court found that many of the claims had been waived or previously determined. By reference to similar and/or identical issues that had been previously raised and rejected in published opinions, the post-conviction court also quickly disposed of those claims.

## BURDENS OF PROOF AND STANDARDS OF APPELLATE REVIEW

To obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. *Id*. § 40-30-110(f) (2003). Evidence

is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence.  *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the court assigned to hear and adjudicate the post-conviction petition has ruled, its factual findings are subject to a *de novo* review by this court; however, we must accord those factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings.  *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001).  A reviewing court, in other words, may not re-weigh or re-evaluate these findings, may not substitute its inferences for those of the post-conviction court, and may not second-guess questions concerning the credibility of witnesses and the weight and value of their testimony. *See Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).  The burden is on the petitioner to show that the evidence preponderates against the lower court's findings.  *See Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).  On the other hand, a post-conviction court's conclusions of law are subject to a purely *de novo* review by this court, with no presumption of correctness. *Fields*, 40 S.W.3d at 457.

For the seven principal claims that the petitioner is pursing on appeal, there are more exacting, claim-specific burdens of proof and standards of appellate review that also apply.  The following is an overview of those burdens and standards.

*Ineffective Assistance of Counsel*:  The Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution both require that an accused in a criminal case receive effective assistance of counsel.  *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975).  To obtain post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of proving (1) that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases," *id*. at 936, and (2) that the deficiencies were prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings were fundamentally unfair, *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).  "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim[, and] a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component."  *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

In terms of appellate review, a post-conviction court's conclusion whether a petitioner has been denied the effective assistance of counsel presents a mixed question of law and fact. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).  As the supreme court explained in *Fields*,

> [A] trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise.  *See* Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn.

1997).  However, a trial court's conclusions of law -- such as whether counsel's performance was deficient or whether that deficiency was prejudicial -- are reviewed under a purely *de novo* standard, with no presumption of correctness given to the trial court's conclusions.

*Fields*, 40 S.W.3d at 458.

*Suppression of Exculpatory Evidence*:  Suppression by the prosecution of exculpatory evidence violates the Fourteenth Amendment's due process guarantee to a fair trial and the Tennessee Constitution's "Law of the Land" Clause. *See Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963); *State v. Ferguson*, 2 S.W.3d 912, 915 (Tenn. 1999).  To obtain post-conviction relief on this basis, the petitioner bears the burden of proving the following:

1)  that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2)  that the State suppressed the information;

3)  that the information was favorable to the accused; and

4)  that the information was material.

*Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001); *see State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995).

The "materiality" aspect of a *Brady* claim is governed by the same prejudice standard as an ineffective assistance of counsel claim; that is, a defendant must show that there is a reasonable probability that the result of the proceedings would have been different.  *See United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).  On appeal, this issue, in our opinion, presents a mixed question of law and fact.  The lower court's findings of fact, such as whether the defendant requested the information or whether the state withheld the information, are reviewed on appeal *de novo* with a presumption that the findings are correct unless the evidence preponderates otherwise. The lower court's conclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely *de novo* standard with no presumption of correctness.

*Apprendi* and *Ring*:  The effect of the rulings in *Apprendi v. New Jersey* and *Ring v. Arizona* on the petitioner's death sentence raises questions of law.  Such questions are reviewed on appeal *de novo* with no presumption as to the correctness of the lower court's conclusions of law. *See State v. Owens*, 20 S.W.3d 634, 637 (Tenn. 2000); *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997).

*The Vienna Convention on Consular Relations*:  This claim, as it was framed and litigated during the post-conviction hearings, presents mixed questions of fact and law.  We review the post-conviction court's factual findings on this claim *de novo* with a presumption that they are correct unless the evidence preponderates against the findings.  The post-conviction court's interpretation of the Vienna Convention on Consular Relations, however, presents a question of law that this court reviews *de novo*.  *See United States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000) (proper interpretation of a treaty presents a question of law), *cert. denied*, 532 U.S. 1056, 121 S. Ct. 2202 (2001).

*Waived or Previously Determined Claims*:  Under the Post-Conviction Procedure Act, waiver occurs when the "the petitioner personally or through an attorney fail[s] to present [the claim] for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented."  Tenn. Code Ann. § 40-30-106(g) (2003).  Waiver in a post-conviction context is determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney.  *House v. State*, 911 S.W.2d 705, 714 (Tenn. 1995).  The presumption that a ground not raised has been waived is rebuttable.  Tenn. Code Ann. § 40-30-106(g) (2003).  To rebut the presumption, the petition must contain "allegations of fact supporting each claim for relief set forth in the petition and allegations of fact explaining why each ground for relief was not previously presented in any earlier proceeding."  *Id*. § 40-30-104(e) (2003).

In the context of a post-conviction proceeding, a petitioner waives an issue on appeal by failing to support his argument with authority.  Tenn. R. Ct. Crim. App. 10(b).  Furthermore, an issue raised for the first time on appeal is waived.  *See State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996).

When a claim has been previously determined, it cannot form the basis for post-conviction relief.  *State v. Harris*, 947 S.W.2d 156, 174-75 (Tenn. Crim. App. 1996).  "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing."  Tenn. Code Ann. § 40-30-106(h) (2003).  "A full and fair hearing" has taken place when "the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence."  *Id*.

*Constitutionality of Capital Punishment in Tennessee*:  As we shall explain in greater detail, the petitioner's claims that the system of capital punishment in Tennessee is unconstitutional, have been previously examined and rejected.  Our appellate review is governed by the adjudications of the supreme judicial tribunal of the state; the precedents that flow therefrom are final and conclusive upon all inferior tribunals, including, of course, this intermediate appellate court. *Fletcher v. State*, 951 S.W.2d 378, 381 (Tenn. 1997); *Barger v. Brock*, 535 S.W.2d 337, 340 (Tenn. 1976).

*Jury Instructions*:  An accused has a constitutional right to complete and accurate jury instructions on the law, and the trial court's failure to provide complete and accurate jury instructions deprives a defendant of the constitutional right to a jury trial.  *See State v. Teel*, 793 S.W.2d 236, 249

(Tenn. 1990). Erroneous jury instructions are subject to harmless error review. *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). If the error, however, is constitutional in nature, there must be a reversal unless the error is harmless beyond a reasonable doubt. *Id.*

Against this background, we now begin our task as a reviewing court of evaluating whether the record and applicable law support the post-conviction court's rulings.

## INEFFECTIVE ASSISTANCE OF COUNSEL

The theme that resonates throughout the petitioner's appeal is that he was deprived of the constitutionally guaranteed right to effective assistance of counsel. The petitioner challenges various factual findings made by the post-conviction court and the court's ultimate rejection of his claim.

### A. Mitigating Evidence & Capital Sentencing Trial

### (i) Deficient Performance

The petitioner argues that trial counsel's failure to investigate and present mitigating evidence about his family background and troubled childhood was not an informed strategic decision. In a closely related argument, the petitioner points to trial counsel's failure to investigate and present mitigating evidence about his mental/emotional history as objectively unreasonable. He additionally challenges how counsel actually presented his mitigation case to the jury.

In addressing attorney performance, courts must be mindful not "to 'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.'" *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997) (quoting *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). A court reviewing counsel's performance should "eliminate the distorting effects of hindsight . . . [and] evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad*, 938 S.W.2d at 369. On the other hand, "deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *Id.*

In now familiar language, the Supreme Court in *Strickland* linked the deference afforded counsel's choices and decisions to the reasonableness of the investigation supporting the choices and decisions.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words,

-27-

counsel has a duty to make reasonable investigations or to make a
reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066.

In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545, 107 S. Ct. 837, 841 (1987); *see Eddings v. Oklahoma*, 455 U.S. 104, 113-15, 102 S. Ct. 869, 876-77 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05, 98 S. Ct. 2954 (1978) (plurality opinion); *Zagorski v. State*, 983 S.W.2d 654, 657-58 (Tenn. 1998); *Goad*, 938 S.W.2d at 369. The right that capital defendants have to present a vast array of personal information in mitigation at the sentencing phase, however, is constitutionally distinct from the question whether counsel's choice of what information to present to the jury was professionally reasonable.

There is no constitutional imperative that counsel *must* offer mitigation evidence at the penalty phase of a capital trial. Rather, satisfactory acquittal of counsel's responsibilities is tied to the objective reasonableness of the investigation that preceded the sentencing trial. In the words of the Supreme Court in *Wiggins v. Smith*, 539 U.S. __, 123 S. Ct. 2527 (2003), "[O]ur principal concern . . . is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*." *Id*. at __, 123 S. Ct. at 2536 (emphasis in original) (concluding that counsel had terminated investigation at an "unreasonable juncture," making a fully informed decision about sentencing strategy impossible). The measure of investigative reasonableness is a particularly fact-intensive inquiry that "includes a context-dependent consideration of the challenged conduct" viewed from counsel's perspective at the time. *Id*. at __, 123 S. Ct. at 2536; *compare Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843 (2002) (failure to offer evidence and final argument at capital sentencing not professionally unreasonable because mitigating evidence already introduced during guilt phase and waiver of argument prevented additional summation by "very persuasive" lead prosecutor), *and Darden v. Wainwright*, 477 U.S. 168, 106 S. Ct. 2464 (1986) (failure to present mitigating evidence not unreasonable when significant time and effort devoted to sentencing preparation from which counsel made informed decision not to open door to state's exploitation of defendant's history of violent crimes and sociopathic personality), *with Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495 (2000) (counsel's performance deficient; did not begin to prepare for sentencing until a week before trial and failed to conduct investigation that would have uncovered extensive records of nightmarish childhood and borderline mental retardation).

In this case, the post-conviction court rejected on factual and legal grounds the petitioner's argument that trial counsel's penalty phase investigation and presentation were professionally unreasonable. Factually, the court credited counsel's time sheets and testimony that

he had communicated on numerous occasions with the petitioner and his adopted parents personally, by phone, and through letters over the course of representation. From those communications, the post-conviction court found "nothing in the record to suggest that they gave [counsel] any reason to suspect that [the] petitioner had endured a difficult or abusive childhood." The petitioner has failed to demonstrate that the evidence preponderates against these factual findings.

From its factual findings, the post-conviction court then concluded that trial counsel's performance was not deficient and that trial counsel "did not behave ineffectively when he relied upon his own client's account of his childhood." We are not bound by that legal conclusion, as it does not receive the highly deferential standard of review afforded to factual determinations, *see Fields*, 40 S.W.3d at 458, but our *de novo* review also convinces us that trial counsel's performance passes constitutional muster.

*Strickland* spoke of the reasonableness of counsel's investigation as being influenced by information from the client. "The reasonableness of counsel's actions," the Supreme Court wrote, "may be determined or substantially influenced by the defendant's own statements or actions. . . . In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066; *see Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002).

The petitioner did not testify at the post-conviction hearings, and the record in this case sheds little light on trial counsel's perspective at the time. We are, however, persuaded that counsel's mitigation preparation did not consist solely of interviews with the petitioner, and we do not interpret the lower court's remarks to be to the contrary. Lead trial counsel testified that he sought family history from Roy and Dagmar Cauthern, but they were very "guarded" in providing information about the petitioner's biological mother and father. The presentence report, prepared in February 1998 on the petitioner's non-capital offenses, listed Raymond Huhm[4] and Christine Wilcox as the biological parents; the mother was listed as deceased, and no information was provided about the father. The petitioner was reported as telling the presentence investigator that he had been told only that his biological father was in prison in California at his birth.

Trial counsel arranged for a sanity and competency evaluation before the first trial. All that the post-conviction record discloses is that the petitioner was declared competent to stand trial and that an insanity defense could not be supported. Doctors Caruso and Spencer came to the same conclusion as a result of their examinations. Whether the evaluation before the first trial generated any useful or alarming insights into the petitioner's mental history beyond competency and sanity is unknown.

Post-conviction counsel insist that trial counsel were confused and did not understand the differences between an evaluation for competency and sanity and one that is undertaken for

_____

[4]Apparently, the surname spelling was taken from a birth certificate on which the surname was misspelled.

mitigation purposes in a capital sentencing trial. The record, however, in our opinion, is equivocal on this point. Co-counsel did not know what type of examination had been performed earlier, and lead counsel did not believe in his judgment that anything else was needed. The presentence report prepared after the 1988 trial advised that the petitioner had *no* history of psychiatric treatment and was not under the care of a physician. The situation in this case, in our view, is clearly distinguishable from the facts in *Cooper v. State*, 847 S.W.2d 521, 525-26 (Tenn. Crim. App. 1992), wherein the defendant's sister testified at the post-conviction hearing that she told trial counsel about her brother's depression, attempted suicide, an emergency screening evaluation at a mental health facility 90 days before the homicide, and an involuntary commitment order for her brother that she obtained on the day of the killing. There is no indication in this case that any childhood miseries were ever divulged or ever made it into the public record, as they did, for instance, in *Williams v. Taylor*. *See* 529 U.S. at 395, 120 S. Ct. at 1514 (records documented that parents were jailed for criminal neglect of petitioner and that petitioner had been committed to custody of social services bureau).

The reports of Drs. Caruso and Spencer in the appellate record mention having reviewed some type of psychological evaluation performed by G. Norman West and Thomas M. Pendergrass. We know from other exhibits in this record that psychiatrist Melvin Dennis performed the petitioner's competency and sanity evaluation. Who Messrs. West and Pendergrass are, when their evaluation was performed, what information was generated, and what conclusions were reached are, from this record, unknowable.

Post-conviction counsel also are critical of trial counsel's failure to seek out any birth, adoption, juvenile, or school records related to the petitioner. The petitioner's birth certificate, made an exhibit in this case, is issued in the petitioner's adopted name, Ronald Michael Cauthern, and contains no information of parentage. The presentence report incorrectly lists the biological father as Raymond "Huhm," not "Huhn," and the biological mother as Christine "Wilcox," not Christine "Tataryn." We find no adoption records, although a certificate of live birth included in the appellate record does correctly list the biological parents and the petitioner's last name as Huhn. As for juvenile or school records, the reports of both Drs. Caruso and Spencer reference having reviewed school records and GED results. Neither expert, however, mentioned anything significant about the records, and post-conviction counsel have not pointed to any information contained therein to indicate that further investigation was warranted.

Some of the most illuminating information is derived from the questions to trial counsel about the sentencing theories. Counsel testified that a two-fold approach was followed that involved emphasizing the greater culpability of the former co-defendant, Patterson, and highlighting favorable things that the petitioner had done with his life, before and after the crimes. At the sentencing phase of the 1988 trial, the petitioner testified. Counsel testified that Cauthern handled direct examination well but "crumbled on cross." Based on that experience, trial counsel specifically wanted to avoid having the petitioner testify about the underlying circumstances of the crime at the 1995 resentencing proceeding.

The record in this case illustrates, in our opinion, why "[j]udicial scrutiny of counsel's performance must be highly deferential" and why courts are required to "indulge [the] strong presumption" that counsel exercised reasonable professional judgment. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Memories dim with the passage of time, and eliminating "the distorting effects of hindsight" so as to "reconstruct the circumstances of counsel's challenged conduct" is inherently difficult. *See id.*, 104 S. Ct. at 2065. Even then, no absolute rules dictate what is reasonable performance for attorneys. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 690-91, 104 S. Ct. at 2066.

The strong presumption in favor of competence interacts with the post-conviction petitioner's burden of proof. The petitioner has the burden of persuasion, and that burden never shifts to the state. The petitioner cannot carry his burden simply by arguing, for instance, that it is always "prudent" or "advisable" to enlist the assistance of various experts. Likewise, a record that is ambiguous or incomplete regarding counsel's actions is inadequate to displace the strong presumption of competence. Regardless what a different investigation might have uncovered, the petitioner must first demonstrate that declining to investigate further was objectively unreasonable performance. *See Henley*, 960 S.W.2d at 583 ("When assessing the performance of trial counsel, courts must eliminate the 'distorting effects of hindsight' and evaluate the challenged conduct from counsel's perspective at the time, rather than from the perspective of a mental health expert offering testimony in a post[-]conviction proceeding.").

We do not discern from the record before us that trial counsel viewed the petitioner's situation as hopeless; nor does it appear that trial counsel was ignorant of or misunderstood the purpose of a capital sentencing proceeding. This case is distinguishable from those evincing an abdication of advocacy. Counsel challenged the especially heinous, atrocious, or cruel aggravator and advocated the existence of numerous, significant mitigating circumstances. Indeed, counsel successfully persuaded the 1995 resentencing jury that imposition of the death penalty was inappropriate punishment for Mr. Smith's murder.

Post-conviction counsel have crafted a record in this case that enumerates what actions trial counsel did and did not take, but the reasons therefor remain largely unclear. Merely reconstructing counsel's conduct is inadequate to demonstrate deficient performance. The *Strickland* Court spoke in terms of reconstructing "the circumstances" of counsel's challenged conduct, and it admonished that an "inquiry into counsel's conversations with the [client] may be critical to a proper assessment of counsel's investigation decisions." 466 U.S. at 691, 104 S. Ct. at 2066. A similar point was made recently in *Massaro v. United States*, ___ U.S. ___, 123 S. Ct. 1690 (2003), wherein the Supreme Court held that the failure to raise an ineffective assistance claim on direct appeal does not bar the claim in later collateral proceedings.

> When an ineffective-assistance claim is brought on direct appeal,
> appellate counsel and the court must proceed on a trial record not
> developed precisely for the object of litigating or preserving the claim

and thus often incomplete or inadequate for this purpose. Under *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), a defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial. The evidence introduced at trial, however, will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis. If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse. *See Guinan* [*v. United States*, 6 F.3d 468, 473 (7th Cir. 1993)] (Easterbrook, J., concurring) ("No matter how odd or deficient trial counsel's performance may seem, that lawyer may have had a reason for acting as he did. . . . Or it may turn out that counsel's overall performance was sufficient despite a glaring omission . . .."). The trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them. And evidence of alleged conflicts of interest might be found only in attorney-client correspondence or other documents that, in the typical criminal trial, are not introduced. . . . Without additional factual development, moreover, an appellate court may not be able to ascertain whether the alleged error was prejudicial.

*Id*. at \_\_\_, 123 S. Ct. at 1694 (citations omitted).

The petitioner did not testify in this post-conviction case, and post-conviction counsel did not delve into the particulars of trial counsel's conversations with the petitioner and with Roy and Dagmar Cauthern. For example, post-conviction counsel did not press when trial counsel spoke of relying on "information" from Roy and Dagmar Cauthern. Also, trial counsel's statement that he "felt comfortable" with his own investigation remained unchallenged. In our opinion, the record before us, without more, is inadequate to support a determination that trial counsel's investigation was constitutionally deficient.

Regarding the mitigation case that was presented in 1995, the petitioner rebukes trial counsel's performance because the evidence was presented in an abbreviated, cursory form with no elaboration about the evidence affecting the petitioner's behavior at the crime scene and in the following days. He also complains that trial counsel should have objected when the jury was instructed that it could not take into account that another jury sentenced co-defendant Patterson to life in prison. This argument largely tracks the petitioner's primary claim that the pretrial investigative efforts were inadequate. We are not prepared to say that trial counsel's strategy was

objectively unreasonable because it failed to avoid a death sentence for Mrs. Smith's killing, and we agree with the following assessment by the post-conviction court:

> Although petitioner makes light of his trial attorney's efforts to save his life during the re-sentencing hearing, the Court found the testimony and exhibits quite persuasive. Counsel effectively presented their theory that petitioner was intoxicated, Patterson was the older and more dominant perpetrator, petitioner did not personally kill either victim, and Patterson, who did not receive the death penalty, was the only person who even arguably deserved it. While attempting not to diminish the seriousness of these offenses, counsel then demonstrated that petitioner was having personal difficulties in 1987, but that he had become a new person following his incarceration and could continue to contribute to society if permitted to live. Although this attempt to secure a sentence other than death was only partially successful, the Court declines to condemn or second guess trial counsel merely because their strategy ultimately failed to produce the desired result.

*See generally Yarborough v. Gentry*, ___ U.S. ___, 124 S. Ct. 1, 5 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").

In summary, the evidence fails to preponderate against the post-conviction court's finding that trial counsel's investigation and representation at his 1995 resentencing trial were within the wide range of professionally competent assistance. Thus, the petitioner has not shouldered his legal burden to prove deficient performance as to these aspects of the legal services that were rendered.

### (ii) Prejudice

Whatever concerns might exist about the reasonableness of trial counsel's performance, the petitioner still must establish prejudice to prevail on a claim of ineffective assistance of counsel. Prejudice in that context means that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In *Goad*, our supreme court identified the following factors to consider in assessing prejudice: (1) the nature and extent of available mitigating proof that was not presented; (2) whether substantially similar mitigating proof was otherwise presented to the jury; and (3) whether there was strong evidence of aggravating factors so that "the mitigating evidence would not have affected the jury's determination." 938 S.W.2d at 371; *see Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S. Ct. 2574, 2586 (1986) ("[I]n determining the existence *vel non* of prejudice, the court 'must consider the totality of the evidence before the judge or jury.'") (quoting *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069).

Turning first to the nature and extent of available mitigating proof that was not presented, the post-conviction court made extensive findings about the "availability" of the proffered mitigating proof. Specifically, the post-conviction court found that background family information was not readily available to trial counsel. From the testimony and demeanor of the petitioner's step-siblings, former wife, and the Popes, the court was convinced that Roy Cauthern "would have done everything in his power to prevent witnesses from offering any testimony which did not cast Dagmar in a favorable light" and that he would not have "permitted his children to discuss family issues with trial counsel, an expert witness, or a jury." As for the Popes and Bud and Melinda Cauthern, the court did not believe that they would have assisted with the petitioner's defense unless Roy Cauthern had consented. According to the court, the only lay witnesses "who even arguably would have cooperated [were] EveAnn and Lucinda."

The post-conviction court also found that based on the close relationship that the petitioner and his adoptive father shared, the petitioner would not have cooperated with a mental health expert and would not have conveyed any useful information to an expert about his family background. Furthermore, even if a mental health expert and lay witnesses had been willing and prepared to testify, the court found it unlikely that, out of respect for his adopted father, the petitioner would have permitted counsel to present any lay or expert testimony that reflected poorly on his adopted mother. The post-conviction court noted that the petitioner did not testify during the post-conviction proceedings and offered no proof that he would have permitted trial counsel to present such testimony. The court was unimpressed that he allowed post-conviction counsel to offer the testimony because, *inter alia*, Roy and Dagmar Cauthern were no longer living and because the petitioner appeared uncomfortable while listening to the lay testimony at the post-conviction hearing, even refusing to remain in the courtroom during the expert testimony.

Furthermore, the post-conviction court found that the petitioner is an untruthful person who "will say whatever he deems to be in his best interest." More pointedly, the court stated, "[The] petitioner has repeatedly lied to the authorities, friends, acquaintances, the 1988 jury and, in this Court's opinion, the experts who testified during the post-conviction proceedings." Notably, the court's assessment is shared by Dr. Caruso who testified that the petitioner has a history of deceitfulness and by Dr. Spencer who testified that the petitioner "tries to present himself as he needs to present himself at the moment" and had changed his story about the incident with Dr. Spencer. Given the petitioner's negligible credibility, the court was not persuaded that any statements or information that he might have given to an expert in 1988 or 1995 would have been consistent with what he recently related to Dr. Caruso.

The petitioner has failed to demonstrate that the evidence preponderates against these factual findings. He argues in a conclusory fashion that the post-conviction testimony is contrary to the court's "speculations" that witnesses would not have testified out of loyalty to Roy and Dagmar Cauthern. In our opinion, the post-conviction court's interpretation of the lay witness testimony was clearly reasonable, particularly in light of the dynamics of the Cauthern family. Moreover, as the post-conviction court noted, Roy Cauthern testified at the penalty phase of the 1988 trial and the petitioner, himself, testified in both penalty trials. Neither man disparaged Dagmar

Cauthern or how she treated the petitioner, and it is considerably more, not less, likely that family members and friends would have refused an invitation to contradict the sworn testimony. *See Nichols*, 90 S.W.3d at 598-99 (petitioner's sister unwilling witness and told counsel that she would not talk about any abuse in the family).

Notably, the petitioner does not directly attack the post-conviction court's assessment of his credibility and truthfulness. Instead, he argues that the evidence does not support the conclusions that he would not have cooperated with a mental health expert, that he would have prevented evidence about his family background from being presented, and that he would not have conveyed the same information to an expert in 1988 or 1995 that he did to Dr. Caruso. His arguments, however, ignore that he has the burden of proving his factual allegations by clear and convincing evidence, which may well require that he give testimony about disputed matters. *See* Tenn. Code Ann. § 40-30-110(a) (2003) ("The petitioner shall appear and give testimony at the evidentiary hearing if such petition raises substantial questions of fact as to events in which the petitioner participated. . . ."). Based on our review of the record, we are not prepared to discard the lower court's reasonable inferences regarding the petitioner's willingness to cooperate in providing family background information or to permit any such information to be offered as mitigation evidence, and we will not second-guess the negative evaluation of the petitioner's credibility.

Even if the petitioner could somehow demonstrate on appeal that the evidence preponderates against the post-conviction court's findings about the nature and extent of available mitigating proof that was not presented, he must still show prejudice in terms of the noncumulative nature of his evidence and that his mitigating evidence would have overcome evidence of aggravating factors, thereby affecting the jury's determination. A comparison of the mitigating circumstances about which the 1995 resentencing jury was instructed with Dr. Caruso's itemization reveals some overlap in the areas of the petitioner's intoxication at the time of the crimes, his recent discovery of the identity of his biological mother, the more recent death of his mother, estrangement from his biological parents, divorce, relative youth, new marriage, fatherhood, involvement with Patterson, and prison behavior. Nonetheless, *Goad* speaks in terms of "substantially similar mitigating evidence," 938 S.W.2d at 371, and we do not believe that Cauthern's post-conviction evidence can fairly be characterized as cumulative.

However, *Goad* requires an examination whether there was strong evidence of aggravating factors so that the mitigating evidence would not have affected the jury's determination. In other words, could the mitigation proof that was not presented reasonably be taken to cast the whole case in such a different light as to undermine confidence in the death sentence returned by the jury for the murder of Mrs. Smith? The post-conviction court held that it could not, and we agree.

First of all, it is important to bear in mind, as did the post-conviction court, that the evidence demonstrated that Dagmar Cauthern's abusive propensities were not uniformly distributed among family members. For at least a five-year period prior to the Smiths' murders, Dagmar Cauthern was incapable of much physical violence owing to the progression of Parkinson's Disease, which increasingly confined her to a wheelchair. When the Popes met her in 1983 or 1984, Dagmar

Cauthern was wheelchair-bound. The petitioner was fifteen or sixteen years old at the time. Mr. Pope, who had contact with the petitioner three to four days a week over a three-year period, described the petitioner as "very likeable" and as a "nice -- average kid" who exhibited no violent tendencies.

Lucinda Miracle, the petitioner's former wife, met Dagmar Cauthern shortly before she and the petitioner were married in 1985. The marriage was short lived, but while it existed, the couple resided periodically with Dagmar and Roy Cauthern. Dagmar Cauthern, although verbally abusive, was quite frail at the time and confined for the most part to a wheelchair.

Of the step-siblings, Melinda Allen was the oldest; she was sixteen years old when the petitioner was born, and she left home sixteen months later when the petitioner was still an infant. From her testimony, the extent of her subsequent personal knowledge of the Cauthern household is unclear. She referred to returning home occasionally to visit and noticing that the petitioner had assumed the privileged child position, "the apple of [Dagmar's] eye."

Bud Cauthern left home when the petitioner was approximately six months old. He spoke of returning home and staying for 60 to 90 days when the petitioner was in high school. Bud Cauthern observed that the petitioner seemed to avoid Dagmar Cauthern as much as possible and that the petitioner "had more freedoms" than Bud Cauthern had in his childhood. Bud Cauthern testified in general terms that Dagmar Cauthern had kicked and hit the petitioner, but no specific details were provided.

Eveann Palmer was the youngest step-sibling and ten years older than the petitioner. She left home when she was eighteen years old. The petitioner, who at that time was eight years old, was, according to Eveann Palmer, regarded as the favorite child. At subsequent unspecified times, Eveann Palmer returned to visit the family, and she said that she noticed that Dagmar Cauthern had begun treating the petitioner as she had the other children. However, Eveann Palmer also described one return visit home that lasted approximately six months. The petitioner was eleven years old at the time, and Eveann Palmer had returned to care for Dagmar Cauthern, who had pleaded with Eveann Palmer for assistance because of her Parkinson's Disease. Although still mean and bitter, Dagmar Cauthern by that time evidently was not capable of inflicting physical abuse.

Even though the petitioner's step-siblings undoubtedly endured abusive, isolated childhoods, it is by no means obvious from the proof that the petitioner's childhood rivaled theirs. The evidence does not preponderate against the post-conviction court's assessment that the petitioner led "a charmed life in comparison to his siblings, that he wasted his opportunity to become a productive citizen despite [his adopted father's] attempts to foster his car-repair skills, and that he abandoned his wife and child." To be sure, evidence about life in the Cauthern household would have been admissible during the penalty retrial; however, the test for prejudice in the post-conviction, ineffective assistance context is more exacting. "[T]he quality of the proposed testimony rather than the quantity of witnesses" determines whether prejudice has been established. *Henley*, 960 S.W.2d at 582.

In our opinion, the family-history evidence is, at best, marginal in terms of illuminating the case in such a way as to undermine confidence in the jury's sentencing decision. At worst, the evidence is reminiscent of the adage in *Strouth v. State*, 755 S.W.2d 819, 827 (Tenn. Crim. App. 1986), that "while many people have unhappy childhoods, [few commit brutal murders]." Inasmuch as the petitioner's step-siblings do not manifest obvious antisocial traits or violent tendencies, a jury reasonably could reject, or be insulted by, any suggestion that the petitioner's criminal actions were attributable to a disadvantaged background.

Turning next to the quality of Dr. Caruso's diagnosis and testimony, we remain unconvinced that the petitioner has demonstrated prejudice. As with the family background information, we recognize that Dr. Caruso's testimony would have qualified as admissible defense mitigation proof. Likewise, we are mindful that the question is not which expert, Dr. Caruso or Dr. Spencer, we might decide is more credible. Rather, the focus remains on whether the evidence not presented undermines confidence in the death sentence because it reasonably could be taken to cast a different light on the defendant's culpability or worth.

The major problem in terms of prejudice is that Dr. Caruso's psychiatric profile is fundamentally incompatible with the existing testimony and evidence. At the post-conviction hearings, trial counsel assessed the petitioner's testimony at the penalty phase of the 1988 trial. In counsel's opinion, the petitioner did well on direct examination, but "crumbled on cross[-]" examination. Beginning with the aggressive cross-examination by co-defendant Patterson's counsel and concluding with the state's questioning, "testimonial disaster" is perhaps a more apt description.

The petitioner testified, *inter alia*, that he had nothing to do with Mrs. Smith's death, did not see Patterson kill her, and did not know how she died. The petitioner spoke about taking drugs and claimed that, although he was not an informant, a local police officer provided him money to purchase drugs. He denied that the drugs he was taking at the time of the murders clouded his judgment, but he said they affected his memory. The petitioner did not think the Smiths would be home that night because he had previously "cased the house" and knew the schedule that the couple kept. His explanation for not leaving the house when he realized it was occupied, however, was disjointed and nonsensical. Other answers he gave were evasive and nonresponsive, and his recollection of events was incomplete.

In one of his previous confessions given to law enforcement authorities, the petitioner claimed that Mrs. Smith had talked to him about getting rid of her husband. He continued to maintain at the sentencing trial that the conversation occurred. He also told the police that he had been having a sexual relationship with Mrs. Smith. During his testimony, the following exchange occurred:

> Q      Now, I assume from your testimony this afternoon, that when
> you told the officers that you were having a sexual relationship with
> Rosemary Smith, that that was a lie, is that right?

A      No, sir.

Q      Sir?

A      Not completely.

Q      Will you tell me then why it is not completely a lie?

A      She had called up where I had lived before and asked me out to dinner and it had been on the occasion of where I had stopped one time for her and got her car running for her again and she went home.

      . . . .

Q      Why did you tell the authorities in your statement of January 13th that you had gone out to a gravel road and that you had had sex with her in the Mercedes, why did you tell the officers that?

A      I believe I was lying to cover for myself.

Regardless of any prior relationship, the petitioner did claim both in his police statements and in his penalty phase testimony that he did not rape Mrs. Smith; rather, he claimed that she voluntarily removed her clothes and did not resist sexual contact with him.

As for other incriminating information given to the police that he claimed was false, the petitioner attributed his statements to volunteering what he thought the police wanted to hear. Regarding one of the officers he was trying to please, the petitioner described the man as "a little perverted." According to the petitioner, that officer wanted the petitioner to "gas it up just a little bit" when he gave his statement.

Without further belaboring the point, we think it evident that the petitioner's testimony in his 1988 trial was not well received by the jury. The jury's verdict in 1995 reinforces that conclusion. Although the petitioner testified at the 1995 resentencing trial, his testimony was limited to personal background information. He did not testify about the murders, and the state was not permitted to cross-examine him about his homicide-related activities. The state elected not to question him at all about the other information. The jury, in turn, saw fit to impose a sentence of life imprisonment for Mr. Smith's homicide.

The quality of Dr. Caruso's testimony, diagnosis, and opinions cannot be evaluated in isolation or in a vacuum. In his report, Dr. Caruso reconstructed the events on the evening of the murders, based on his interviews with the petitioner, in the following fashion:

On the night of the offense, Cauthern and Patterson first planned to steal money from the trunk of Charles Hand's car at Cauthern's suggestion. However, when they went by Hand's house, they were foiled without even attempting the robbery. Cauthern could not recall whether Hand's car was not there or whether they had learned that Hand had removed the money from his trunk.

Cauthern perceived that Patterson was angry with him and sought to salvage his standing with Patterson by suggesting that they burglarize the home of Patrick and Rosemary Smith, whom Cauthern believed to be doctors at Blanchfield Army Community Hospital at Ft. Campbell, Ky. Cauthern had previously worked on the Smiths' cars. Although it has been suggested that Cauthern viewed the Smiths as his friends, Cauthern actually felt that the Smiths looked down on him, as if he was "the help."

Cauthern believed that the Smiths would not be home and told Patterson such. Cauthern believed that they could easily pick up a few thousand from the burglary. Cauthern and Patterson drove to the Smiths' home in a Camaro Z-28 and pulled in behind the house. Noting that the eight cylinder Camaro was quite loud, Cauthern and Patterson both remarked in separate statements that they believed that the Smiths must not have been home if they did not awaken when Cauthern and Patterson pulled into the yard.

Patterson and Cauthern got out of the Camaro wearing dark clothes, gloves, and masks. Patterson was carrying a .45 cal. pistol, and Cauthern was carrying a .38 cal. pistol. Patterson tried to kick the back door in but failed. Cauthern cut the phone lines, reasoning that if the Smiths somehow were home, that he and Patterson could get away if the Smiths could not call the police.

Cauthern broke in the back window with a hammer, and Cauthern and Patterson entered the house. Cauthern stated that he was certain that the Smiths were not home at that point, as he could not conceive of how they could sleep through that much noise. Cauthern and Patterson began searching the first floor of the house for valuable items to steal but came up with little other than a VCR. Cauthern then proceeded up the stairs, looking for money or other valuables.

After reaching the top of the stairs, Cauthern fell, dropping the hammer that he was carrying. This appears to be supported by the crime scene photos, which show a hammer just beyond the doorway

of a room at the top of the stairs. (Cauthern claimed that he had brought the hammer to the crime scene and kept it with him in order to prevent leaving the hammer at the crime scene.). When Cauthern fell to the floor, he became aware of a smell in the home like his childhood home in Dickson. Cauthern then suffered a flashback to a time in his childhood home in Dickson when he had tripped over a vacuum cleaner when walking in the dark. At that time, Dagmar Cauthern had heard him fall and came to find that he had broken an attachment to the vacuum cleaner. Dagmar Cauthern had beaten him at that time, striking him in the head and between the eyes, making his eyes tear. She apparently had believed that he was crying and beat him more severely.

At the crime scene, Cauthern was dazed and stumbled to his feet. He could not recall clearly what had happened next, but recalled feeling that he had been hit between the eyes and was "seeing black." Cauthern could not recall whether his fall had awakened Patrick Smith and Smith had struck Cauthern (which would be suggested by Patterson's statement that Cauthern had preceded him up the stairs and got into a struggle with Smith) or whether Cauthern had merely hit his nose in the course of the fall.

Cauthern recalled feeling enraged, frightened, and vulnerable. Cauthern recalled that Patterson subdued Smith and that Cauthern had led Rosemary Smith from the room. Cauthern sensed that Rosemary Smith was feeling contempt for him, "looking down her nose at (him)." He also noted that she was wearing a long white nightgown, "the kind Dagmar always wore." This only added to his feelings of rage. Cauthern tore her nightgown off, pushed her down and raped her.

Upon later questioning, Cauthern identified a number of Rosemary Smith's qualities that seemed to recall Dagmar Cauthern. Cauthern had apparently learned from Patrick Smith that Rosemary controlled the purse strings, limiting what Patrick could spend on their vehicles at any one time. Cauthern in fact recalled witnessing Rosemary Smith angrily berating Patrick Smith about his expenditures, much as Dagmar used to berate Roy Cauthern, Sr. Cauthern did not appear to have made this association prior to being questioned more closely about it.

Cauthern was asked directly if he saw Dagmar's face when he raped Rosemary Smith, but he denied it. He stated now that he wished it was Dagmar, but at the time he "only saw black and felt rage."

After Cauthern raped Rosemary Smith, he tried to strangle her with his hands but was unable to kill her. Patterson came in and strangled her using a scarf and a vase. Cauthern believed that Patterson raped her before killing her but stated that he was unsure, as he had difficulty recalling what had happened next. He stated that many of his recollections of that night have an unreal, movie-like quality to them. He recalled being downstairs and leaving carrying some items, but did not remember whether he had gathered them. He believes that Patterson had taken things that belonged to Patrick Smith, while he took things that belonged to Rosemary Smith, but stated that he could not be sure. He could not recall whether he drank a wine cooler but believed that Patterson may have.

Had Dr. Caruso's information been presented to the jury during the 1995 resentencing trial, the petitioner's sworn testimony from the penalty phase of his 1988 trial would have become a legitimate and proper subject for inquiry. Doctor Caruso's mitigation-related evidence, in other words, would have inevitably opened up what trial counsel successfully suppressed in 1995: the petitioner's self-destructive cross-examination testimony from 1988. Even worse -- although unavoidable -- Dr. Caruso's explanation for the petitioner's actions on the evening of the murders relies on the petitioner's account to Dr. Caruso of what happened, which is inconsistent in many important respects with his confessions and earlier testimony.

The following represents a partial summary of the numerous inconsistencies noted by the post-conviction court:

- The petitioner had previously testified that the Smiths had been good to him and were friendly. Doctor Caruso's report recites that the petitioner actually felt that the Smiths "looked down on him, as if he was 'the help.'"

- In his report, Dr. Caruso speculates that Mr. Smith may have struck the petitioner when the petitioner was on the stairs. This theory is inconsistent with both Patterson's and the petitioner's testimony in 1988 and the physical evidence at the crime scene.

- According to Dr. Caruso's theory, the petitioner fell at the top of the staircase in the residence, may have hit his head, had a flashback to his childhood, and raped and tried to strangle

Mrs. Smith in a confused state and/or uncontrollable rage. None of the petitioner's previous accounts of the events of that evening is consistent with this theory.

- Doctor Caruso's report relates the petitioner's claim that he "only saw black and felt rage" when he attacked Mrs. Smith. This claim is inconsistent with every other account of the incident, including the petitioner's statement to Dr. Spencer that he wanted to help Mrs. Smith but that he was acting pursuant to Patterson's direction.

- The "flashback/rage/lack of control theory" is belied by the petitioner's post-offense behavior wherein he bragged about his conduct, sold some of the stolen property, gave Mrs. Smith's jewelry to his ex-girlfriend, and seemed happy.

After careful consideration, we are persuaded, as was the post-conviction court, that Dr. Caruso's psychiatric profile, built on the petitioner's most recent account of events, would have been antagonistic to the partially successful efforts of trial counsel in 1995 to save the petitioner's life. For instance, presenting to the jury that the petitioner viewed the Smiths as looking down on him as if he were "the help," would not have engendered any sympathy from the jury; indeed, it would have permitted the state to show that the petitioner previously had attempted to convince the police that he was involved in a sexual relationship with Mrs. Smith and that she had solicited him to get rid of her husband. The post-conviction court made a specific finding in this regard that Dr. Caruso's testimony "would have angered the jurors and diminished the effectiveness of other mitigation proof" presented by trial counsel. The post-conviction court made this finding in the course of discharging its duty to "consider the quality of the proposed testimony," *Henley*, 960 S.W.2d at 582, and because the lower court made this finding after hearing Dr. Caruso testify, we defer to the court's assessment of the proposed testimony. Also, "[t]his court has previously recognized that [mitigating] proof [of a defendant's emotional or mental problems] may have doubtful effect in 'lessening [a defendant's] culpability in the eyes of the jury.'" *Michael Lee McCormick v. State*, No. 03C01-9802-CR-00052, slip op. at 23 (Tenn. Crim. App., Knoxville, June 17, 1999) (quoting *Harries v. State*, 958 S.W.2d 799, 807 (Tenn. Crim. App. 1997)).

The petitioner's newest version of events, related to Dr. Caruso, serves foremost to showcase the petitioner's untruthfulness and manipulative tendencies, which have not been ameliorated by his prolonged incarceration. Furthermore, although Dr. Caruso labored mightily to draw a specific connection between Dagmar Cauthern and the petitioner's sexual, homicidal attack on Mrs. Smith, his efforts were largely undercut by the petitioner's own denial that he saw Dagmar Cauthern's face when he raped Mrs. Smith -- a denial that the petitioner repeated when he was examined by Dr. Spencer. Thus, we are unpersuaded that, had Dr. Caruso's or similar testimony been offered at the 1995 resentencing trial, the result would have been more favorable to the petitioner.

Even if Dr. Caruso's testimony would have made a positive contribution to the petitioner's mitigation case -- a position that we by no means endorse -- the petitioner must still establish that the aggravating factor was not so strong as to overcome the effect that the mitigation evidence would have had on the jury deliberations. *See Goad*, 938 S.W.2d at 371. We begin with the circumstances surrounding Mrs. Smith's murder, which abundantly support the "especially heinous, atrocious, or cruel" aggravating circumstance. On appeal from the petitioner's 1995 resentencing trial, our court detailed at length the sufficiency of the evidence on this point.

> The [petitioner] argues that the evidence implying that the victim lost consciousness as early as thirty seconds into the ordeal is insufficient to support a finding of the sole aggravating circumstance. . . .
>
> . . . .
>
> As the State asserts, Mrs. Smith suffered mental torture when she was forcibly removed from her bed while screaming in the middle of the night, hidden in a closet while her husband was dead or dying, and subsequently raped. The evidence, though not directly showing that Mrs. Smith knew the exact fate of her spouse, supports the strong assumption that she heard what was happening and knew her husband was in dire circumstances. The video shown to the jury clearly depicts that a profound struggle occurred between the assailants and Mr. Smith; the bed covers were strewn about the room, Mr. Smith was kneeling against the bed, fingernail scratch marks were found on his neck, and the bed frame was broken away from the headboard and the mattress was lying on the floor. In his statement to the police, the [petitioner] said that as Patterson left the master bedroom after killing Mr. Smith, he grabbed Mrs. Smith as she was coming back down the hallway. The jury could easily have concluded that she was going to check on her husband after she heard the struggle.
>
> It clearly appears from the record that the strangulation occurred after the rapes and while the victim was conscious. Even though [*State v.*] *Odom*[, 928 S.W.2d 18 (Tenn. 1996),] states that rape does not ordinarily constitute torture or serious physical abuse, we find that the facts of the case *sub judice* more distinctly demonstrate their existence. In *Odom*, the victim was raped once. Here, the victim was raped twice, and by two different individuals. Moreover, the rapes were not committed upon the initial criminal confrontation. In *Odom*, the rape ensued almost immediately after the victim was accosted. Mrs. Smith was not raped until after she was placed in a closet where she apparently heard the attack on her

husband. And after the rapes occurred, the assailants further tortured and ridiculed Mrs. Smith by pouring two bottles of wine coolers over her naked body.

Mrs. Smith remained conscious for at least thirty seconds while she was being strangled after she had been twice raped. The abrasions on her neck indicate that she tried, unsuccessfully, to release the pressure from around her neck. Although Dr. Harlan testified that he was uncertain from the medical evidence whether a break occurred in the strangulation process, other testimony suggests that when the initial attempt to strangle proved futile, an apparent second, more successful, attempt to strangle Mrs. Smith was made using a tourniquet device. As Joseph Denning testified, the [petitioner] told him he made the first attempt to strangle Mrs. Smith. According to Denning's testimony, the [petitioner] lacked the strength to kill her, so Patterson had to complete the act using the vase in the scarf. The abrasions on Mrs. Smith's neck indicate that she was conscious during a portion of the struggle. It appears from the record that Mrs. Smith was forced to endure not only the severe physical pain of the strangulation, but the grueling mental pain as well of not knowing when and if the assailants would continue what probably appeared to her as repeated acts of strangulation and torture.

. . . [W]e believe that the strangulation, combined with the two rapes and the evidence surrounding this entire criminal episode, does support the jury's finding of the especially heinous, atrocious, or cruel aggravating circumstance in this case.

. . . .

Even though there is some testimony which suggests that Patterson was the one who ultimately strangled Mrs. Smith to death, the testimony also shows that the [petitioner] attempted to strangle the victim but simply did not have enough strength to bring the task to the intended conclusion. This does not substantially reduce his culpability.

*Cauthern*, No. 02C01-9506-CC-00164, slip op. at 11-13. Although delving into fewer factual details, the Tennessee Supreme Court also held that the evidence was sufficient to support the aggravating circumstance and to support a finding that the aggravating circumstance outweighed the mitigating circumstances presented to the jury. *See Cauthern*, 967 S.W.2d at 732-34.

At the 1995 resentencing trial, the jury concluded that the state had not proven beyond a reasonable doubt the "especially heinous, atrocious, or cruel" aggravating circumstance as related to Mr. Smith's murder, and it is reasonable to conclude that the features distinguishing Mrs. Smith's murder for the jury were the multiple rapes while she was still conscious, the multiple strangulation attempts that required considerably more force than applied to Mr. Smith, and her awareness of what was happening to her husband. We are confident that none of the mitigating evidence that might have been presented would have detracted substantially from the disturbing and gruesome circumstances of Mrs. Smith's murder. At best, such evidence would have fractured the defense strategy at resentencing to portray Patterson as being more culpable[5] and to show favorable aspects of the petitioner's life, both prior to and following the homicides, leaving the jury with a morass of conflicting lies that the petitioner had been telling since 1987 and various, tenuous excuses for his actions.

Therefore, in light of all the circumstances of this case, we conclude that the petitioner has not demonstrated deficient performance by trial counsel in connection with the investigation and presentation of mitigation evidence and, moreover, has not shown a reasonable probability that the result of the 1995 trial would have been different.

## B. Investigation of Patterson's Background

The petitioner next registers a hodgepodge of complaints about trial counsel's performance relative to the co-defendant, Brett Patterson.[6] The petitioner argues that trial counsel did not adequately develop the theory that Patterson was the primary actor who dominated the scene of the crime; as support, he points to the death penalty verdicts in his 1988 trial and the subsequent single death penalty verdict in his 1995 resentencing trial. That argument, of course, is legally insufficient. *See Goad*, 938 S.W.2d at 369 ("The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation."); *Spadafina v. State*, 77 S.W.3d 198, 207 (Tenn. Crim. App. 2000).

The petitioner charges that had trial counsel investigated Patterson's background, counsel would have discovered that Patterson was a suspect in the strangulation death of a woman in New Mexico. The petitioner, however, fails to explain why trial counsel should have set out on such a course of investigation prior to his 1988 trial or even how such information relating to an unsolved homicide would have been uncovered. The petitioner has offered no evidence of deficient

---

[5] According to Dr. Caruso's construct, the petitioner raped and strangled Mrs. Smith because he had a flashback that propelled him into unmanageable rage. This theory seems inconsistent with the proposition that the petitioner was acting under the substantial domination of Patterson.

[6] In its written Order, the post-conviction court dealt at length with the petitioner's complaint that trial counsel was ineffective for failing to seek a severance from Patterson before the 1988 trial. On appeal, severance is mentioned briefly and only in passing by the petitioner. We discern no reason to belabor the severance question; suffice it to say that we agree with the post-conviction court that according to trial counsel's testimony, the decision to pursue a joint trial was "a well-informed strategic decision," which is not amenable to attack as being professionally unreasonable.

performance on this point in connection with his 1988 trial. Furthermore, as the post-conviction court noted, assuming the evidence could be categorized as relevant for some non-propensity purpose, the petitioner has not shown by clear and convincing evidence that Patterson actually committed the offense. The failure to establish a proper foundation would have resulted in the exclusion of the evidence.[7]

The petitioner then shifts to his 1995 resentencing trial. By that time, the petitioner claims, Patterson's suspected involvement in the New Mexico homicide was known through other proceedings. The petitioner criticizes counsel for not independently investigating "this startling information" once it came to light, but there appears to be little to investigate. The testimony of the New Mexico law enforcement officers at the post-conviction hearing was not particularly revealing or useful beyond the initial proposition that Patterson was a suspect.

The petitioner speculates that with the New Mexico information, his trial counsel need not have felt threatened by what Patterson might say if called to testify at the 1995 resentencing trial. The petitioner opines that "if the defense had done its homework," Patterson could have been neutralized as a witness, leaving the petitioner free to give his version of the events of the crime. This line of attack on counsel's performance is precisely the type of second guessing that *Strickland* soundly condemns. In addition, it is axiomatic that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black*, 794 S.W.2d at 757. A petitioner is not entitled to relief on this ground "unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." *Id*. at 758. The petitioner did not present Patterson at the post-conviction hearings, and for this additional reason, his claim fails.

## C. Cross-examination of State Witness James Andrew

James Andrew, who knew both the petitioner and Patterson, testified for the state at the petitioner's 1988 trial and the 1995 resentencing trial. Andrew related incriminating statements and admissions that the petitioner made to him about the petitioner's and Patterson's involvement in the Smiths' murders.

> . . . James Phillip Andrew testified [at both trials] that he was with the defendant, Ronnie Cauthern, and Brett Patterson shortly after the offenses. While watching television, they all saw an account of the Smiths' murders in which a reward was offered for information. Cauthern told Andrew that he had worked for the Smiths in the past and that he broke into their home and made the woman get into the

---

[7] Tennessee Evidence Rule 404(b), regarding the admission of evidence of other crimes, wrongs or acts, did not become effective until 1990. Nevertheless, at the time of the petitioner's 1988 trial, the same foundational requirements applied pursuant to the supreme court's decision in *State v. Parton*, 694 S.W.2d 299 (Tenn. 1985).

closet, while he and Patterson strangled the man. Cauthern told Andrew that he raped the woman once and that he had stolen a wedding ring, a VCR, and some credit cards. Andrew testified that Cauthern seemed proud of what he had done, and that he threatened to kill Andrew if he repeated anything about the murders.

*Cauthern*, 967 S.W.2d at 730.

As part of the petitioner's bid for post-conviction relief, he claims that trial counsel's "tepid questioning" of Andrew at both trials constituted deficient, prejudicial performance. The petitioner insists that trial counsel should have mounted a "hard hitting" cross-examination attacking Andrew's sobriety and motive to fabricate the petitioner's incriminating statements.[8]

Andrew did not testify at the post-conviction hearing, but the parties entered into and submitted a written stipulation regarding what Andrew's testimony would have been. According to the stipulation, Andrew would have said that he was never interviewed by the petitioner's trial counsel. The post-conviction court, however, credited the live testimony of trial counsel who asserted that he had interviewed Andrew prior to the 1988 trial, which was corroborated by a file memorandum of trial counsel noting a February 11, 1988 conference with Andrew.

As for the quality of trial counsel's cross-examination, the post-conviction court found, with one exception, that the scope of examination was a trial tactic based on reluctance to ask Andrew, who was "odd and unpredictable," too many questions. The exception was compensation that Andrew had received or hoped to receive in return for his assistance to the police, about which trial counsel claimed to be ignorant. The post-conviction court found that trial counsel should have known about the compensation because it was publicized in a local newspaper article, a copy of which was in trial counsel's file. We find no basis to disturb the post-conviction court's assessment of counsel's performance.

Nor do we discern any basis to displace the post-conviction court's conclusion that even if counsel's cross-examination was deficient, the petitioner has not demonstrated the requisite prejudice. Abundant evidence, aside from Andrew's testimony, supported the petitioner's dual homicide convictions from his 1988 trial. Furthermore, Andrew's resentencing trial testimony was halting and somewhat vague. Indeed, at one point during Andrew's direct examination, the trial court interrupted to inquire, "General, does he have anything relevant to say about this case?" Andrew did testify that the petitioner related that he and Patterson had attacked Mr. Smith and strangled him to death, but the jury obviously did not find that testimony adequate to support the death penalty for Mr. Smith's homicide. Andrew's testimony about the petitioner's involvement in

---

[8] In connection with this issue, post-conviction counsel make passing reference to a police report containing useful information that could have been deployed to impeach Andrew. We do not understand the petitioner to be arguing that trial counsel was ineffective for failing to discover the report; rather, in a different post-conviction claim, which we will subsequently discuss, the petitioner argues that the report contained constitutionally exculpatory evidence that the state withheld from trial counsel.

-47-

Mrs. Smith's death was even less specific; Andrew merely testified that the petitioner said that he took Mrs. Smith out of the closet and raped her.

Accordingly, this claim does not warrant post-conviction relief.

### D. Testimony Inconsistent with Forensic Evidence

The petitioner registers a separate complaint in his appellate brief that there is no forensic support for the notion that a wine cooler was poured over the body of Rosemary Smith. As framed, this complaint does not merit post-conviction consideration, and absent an explanation why this ground was not previously presented in any earlier proceeding, we regard it as waived. *See* Tenn. Code Ann. § 40-30-104(e) (2003). Furthermore, to the extent that the petitioner is attempting to assert an ineffective assistance of counsel claim, his cursory statement that counsel abandoned their duty to challenge the state's case is wholly insufficient to merit post-conviction relief.

### E. The Petitioner's German Citizenry and the Vienna Convention on Consular Relations

The petitioner next claims that trial counsel was ineffective in failing to discover his German ancestry and failing to inform him of his rights under the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, 1969 WL 97928. Much of this argument duplicates the petitioner's broader allegation that trial counsel did not adequately investigate his background, thereby prejudicially denying the petitioner the benefit of legal services and assistance from the German government. At a later point in his appellate brief, the petitioner also independently alleges that following his arrest, he was entitled to certain international rights and privileges secured by the Vienna Convention that were not, in fact, respected, thereby entitling him to post-conviction relief. Inasmuch as both issues require an in-depth examination of the Vienna Convention on Consular Relations, we defer our discussion of counsel's claimed ineffectiveness until we address the substantive aspects of the Vienna Convention later in this opinion.

### EXCULPATORY EVIDENCE

The petitioner asserts that his constitutional due process rights were violated by the state's suppression of exculpatory evidence involving James Andrew, who testified for the state in both the 1998 trial and the 1995 resentencing trial. Andrew related various incriminating statements made by the petitioner that implicated the petitioner in the homicides. Naturally, Andrew's credibility was an item of concern to the petitioner.

The first item of evidence to which the petitioner points is a police report dated January 23, 1987, prepared by Detective R.J. DiFiore, which recites in part:

> Mr. Andrew said that on the night of the 19th Eric Barbee came to his
> home . . . and wanted Mr. Andrew to tell Patterson's lawyer that
> Patterson had stayed in the car while Ronnie did the murders and that

on the night of the armed robbery, he had not seen Patterson and Ronnie together.

Patterson and Barbee were friends, and Barbee's visit to Andrew occurred while the petitioner and Patterson were detained in jail awaiting trial. The petitioner interprets the report as showing that Patterson used his friend, Barbee, to try to influence or intimate Andrew into changing his story. The petitioner concedes that the impact of Barbee's attempt remains unknown.

The second item of evidence was information possessed by the state that Andrew had contacted the police and made a statement in expectation of a $5,000 reward. The third item was information that Andrew's vehicle had been vandalized by an unknown individual after the petitioner had been arrested. Regarding the last two items, the parties entered into a written stipulation at the post-conviction hearing that if Andrew were called to testify, he would relate the following:

a. He is the same James Andrew who testified for the State in the 1988 trial of Ronnie Cauthern and Brett Patterson, and the 1995 resentencing of Ronnie Cauthern.

b. Prior to calling Lt. David Baize to provide information concerning the deaths of Rose Mary [sic] and Patrick Smith, he heard on television that there would be a reward of $5000 for information leading to the arrest and conviction of the person or persons responsible for their deaths.

c. On the Monday following the Sunday news report in which he learned of the reward, he called and spoke to Lt. David Baize and stated that he was calling abut the Smith murders and asked about the reward. He informed Baize that he would need the reward to get out of the area if he told the police what he knew. Baize told him to come in and tell them what he knew and that he would take care of it.

d. He met with Lt. Baize and Assistant District Attorney Wade Bobo, approximately every day for the first week. Subsequently, he met with them several times before the 1988 trial. Each time he asked about the reward, Lt. Baize told him not to worry about it, that he should worry about the big things not the little things. Up to and through the 1988 trial, Andrew continued to expect that he would be paid the $5000 reward. On the way back to the airport, after the trial, Baize remarked that they had brought him to Clarksville and paid for his hotel and that was a vacation worth $5000.

e.  As a result of his cooperation with the police in this case, Andrew was forced to move back onto the post at Ft. Campbell. To assist with this move, Wade Bobo or David Baize gave him $300 cash. This was the only money or thing of value that he received for his assistance to the police in this matter. Half of this money was given to Joe Denning to offset Andrew's share of the rent.

f.  He had [sic] been questioned, at the 1988 trial or the 1995 resentencing, about expectations of a reward, he would have testified as set out above.

g.  On or about January 19, 1987, Eric Barbee came to Andrew's home and wanted Mr. Andrew to tell Brett Patterson's lawyer that Patterson had stayed in the car while Ronnie Cauthern did the murders.

h.  On the night of January 21, 1987, an unknown subject or subjects vandalized Andrew's blue, 1978 Pontiac TransAm which was parked at his home. The seats had been cut, the word "murder" had been sprayed on the front windshield with orange paint, the bra on the front of the car had been cut and the vehicle had been hit all over and bent up very badly.

i.  Andrew reported the above incidents to police and would have testified as indicated in paragraphs g and h above had he been questioned by an attorney at the 1988 trial or 1995 resentencing.

j.  No one acting for Ronnie Cauthern contacted him or asked to interview him before either the 1988 trial or the 1995 resentencing.

The post-conviction court made detailed findings on this claim. With regard to the police report and Andrew's compensation, the court found that the petitioner had satisfied the first part of the *Brady* analysis that trial counsel had requested from the state, orally and in writing, any information about agreements or deals with witnesses. *See Johnson*, 38 S.W.3d at 56. Concerning the second part of the analysis, whether the state suppressed the evidence, the court assumed, without expressing ruling, that the state failed to turn over the information. *See id*. On appeal, the state does not earnestly contest the two findings, although it does argue that some of the information seemed to be equally available to the parties. *See State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (prosecution not required to disclose information that accused already possesses or is able to obtain). The presumption of correctness that attaches to these findings has not been overcome.

-50-

The post-conviction court next concluded that the petitioner was partially successful in showing that the information was favorable, the third part of the analysis. The vehicle vandalism would not, in the court's estimation, have helped the petitioner given that the petitioner had threatened to kill Andrew and that Andrew was harassed and threatened after he cooperated with the police. On the other hand, Andrew's compensation and Barbee's attempt to influence Andrew were favorable to the petitioner, according to the court. We part company with the post-conviction court on the automobile damage assessment. Granted, the information had marginal value, particularly because the identity of the vandal was unknown; the information, however, had favorable tendencies, if for no other reason than multiple defendants were on trial. *See Kyles v. Whitley*, 514 U.S. 419, 451, 115 S. Ct. 1555, 1574 (1995) (warning not to "confuse[] the weight of the evidence with its favorable tendency").

With the fourth part of the analysis, the materiality of the information, the post-conviction court concluded that the petitioner had not shown a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different. We agree.

In terms of the petitioner's guilt, Andrew's testimony was damaging primarily because it placed before the jury the petitioner's admission to killing the Smiths. The state, however, prosecuted the homicides as felony murders, pursuant to which it was unnecessary for the state to prove that the petitioner personally killed the victims. Evidence, independent of Andrew's testimony, solidly linked the petitioner to the burglary of the Smiths' residence. Therefore, even had Andrew's credibility been thoroughly demolished, confidence in the outcome of the 1988 trial is not undermined.

In terms of the 1995 resentencing trial, even if the suppressed evidence would have persuaded the jury that Andrew testified falsely and was motivated to collect reward money, confidence in the death sentence for Mrs. Smith's homicide is not undermined. The petitioner insists that the suppressed evidence is constitutionally material because it demonstrates that Patterson used Barbee to influence Andrew's testimony and because it could have been used to impeach Patterson had he testified. We fail to discern the logic of the petitioner's argument. First, whether Barbee, in fact, influenced Andrew's testimony is uncertain, although it would appear not in light of the information that Andrew provided to law enforcement before he was visited by Barbee. Second, if Patterson was the person who sent Barbee to Andrew, Patterson's intent was to get Andrew to negate Patterson's involvement in the homicides, which did not occur. We fail to see how impeaching Andrew translates into proving that Patterson was "more" culpable than the petitioner. Third, as we previously observed, Andrew's resentencing testimony was far from compelling. The jury declined to impose the death penalty for Mr. Smith's homicide even without knowing about Andrew's reward-money motivation. Last, impeachment of Andrew in no manner negates the suffering and torture that Mrs. Smith experienced, and demonstrating the petitioner's participation in her death does not hang on Andrew's credibility.

From all the evidence, we have no hesitation in concluding that the information regarding Andrew about which the petitioner complains could not reasonably be taken to put the case in such a different light as to undermine confidence either in the petitioner's convictions or his death sentence for Mrs. Smith's homicide.

### *APPRENDI V. NEW JERSEY* and *RING V. ARIZONA*

For his next issue, the petitioner mounts an attack on his death sentence based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002). Relying on *Apprendi*, the petitioner argues that the failure to submit to the indicting grand jury the aggravating circumstance relied upon to qualify him for the death penalty violated numerous federal and state constitutional rights. Relying on *Ring*, he advances a second argument directed to the Tennessee Supreme Court's affirmance of his death sentence from the 1995 retrial, despite an erroneous jury instruction. The petitioner argues that by finding harmless error, the supreme court improperly substituted its judgment for that of a correctly-instructed jury.

### A. *Apprendi v. New Jersey*

In *Apprendi*, the Supreme Court examined a New Jersey provision permitting a judge to impose a sentence exceeding the statutory maximum for an offense if the judge finds, by a preponderance of the evidence, that the offense qualified as a hate crime. The Supreme Court struck down the provision, holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S. Ct. at 2362-2363.

This holding from *Apprendi* does not, in our opinion, avail the petitioner relief.

First, it is persuasive that at least six federal circuit courts of appeal have concluded that *Apprendi* does not apply retroactively to cases on collateral review. *See Burch v. Corcoran*, 273 F.3d 577 (4th Cir. 2001); *In re Clemmons*, 259 F.3d 489 (6th Cir. 2001); *United States v. Moss*, 252 F.3d 993 (8th Cir. 2001); *United States v. Sanchez-Cervantes*, 282 F.3d 664 (9th Cir. 2002); *Daniels v. United States*, 254 F.3d 1180 (10th Cir. 2001); *McCoy v. United States*, 266 F.3d 1245 (11th Cir. 2001). Our court, likewise, has declined to extend *Apprendi* to cases on collateral review, such as requests for post-conviction relief or requests to reopen a prior post-conviction petition. *See Stephen Michael West v. State*, No. E2001-02520-CCA-R28-PC (Tenn. Crim. App., Sept. 6, 2002); *Paul Gregory House v. State*, No. E2001-02519-CCA-R28-PC (Tenn. Crim. App., Sept. 5, 2002); *David McNish v. State*, No. E2001-02633-CCA-R28-PC (Tenn. Crim. App., Aug. 15, 2002), *perm. app. denied* (Tenn., Dec. 16, 2002); *Donald Wayne Strouth v. State*, No. E2001-02083-CCA-R28-PC (Tenn. Crim. App., Jan. 29, 2002), *perm. app. denied* (Tenn., Oct. 28, 2002).

Second, the *Apprendi* Court did not reach the issue whether a defendant is entitled to have the aggravating circumstances relied upon by the state alleged in the indictment. "Apprendi has not here asserted," the Supreme Court noted, "a constitutional claim based on the omission of

any reference to sentence enhancement or racial bias in the indictment. . . . We thus do not address the indictment question separately today." *Apprendi*, 530 U.S. at 477 n.3, 120 S. Ct. at 2355 n.3.

Last, in *State v. Dellinger*, 79 S.W.3d 458 (Tenn. 2002), *cert. denied*, 537 U.S. 1090, 123 S. Ct. 695 (2002), the Tennessee Supreme Court held that the "principles of *Apprendi* do not apply to Tennessee's capital sentencing procedure." *Id.* at 467. "Neither the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first degree murder prosecution." *Id.* In accordance with *Dellinger*, we conclude that the principles of *Apprendi* do not apply to Tennessee's capital sentencing procedure.

Recognizing that his argument was rejected in *Dellinger*, the petitioner insists that the efficacy of *Dellinger* has been implicitly undermined by the subsequent Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002). In *Ring*, the Supreme Court addressed a claim that Arizona's capital sentencing scheme violated the Sixth Amendment because it permitted a judge to impose the death penalty based on the presence of aggravating circumstances and the judicial determination that no mitigating circumstances were sufficiently substantial to call for leniency. The Supreme Court extended the principles of *Apprendi* to capital sentencing and struck down the Arizona procedure to the extent that it allowed a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. *Id.* at 609, 122 S. Ct. S. Ct. at 2443.

Any doubt regarding *Ring*'s effect on *Dillinger* was laid to rest on January 5, 2004, when the Tennessee Supreme Court released its decision in *State v. Daryl Keith Holton*, ___ S.W.3d ___, No. M2000-00766-SC-DDT-DD (Tenn., Nashville, Jan. 5, 2004). One of the issues before the supreme court in that case was whether *Dellinger* was wrongly decided in light of *Ring v. Arizona*. Our supreme court rejected the notion and explained,

> After the release of our opinion in *Dellinger*, the United States Supreme Court issued its opinion in *Ring*. The narrow question presented in *Ring* was "whether [an] aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee, made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury." 536 U.S. at 597. The Court in *Ring* pointed out the limited nature of the issue, noting that of the thirty-eight states with capital punishment, twenty-nine, including Tennessee, "commit sentencing decisions to juries." *Id.* at 608 n.6. The Court also emphasized that *Ring* did not contend that his indictment was constitutionally defective and noted that the Fourteenth Amendment has not been construed to apply to the states the Fifth Amendment right to "'presentment or indictment of a Grand Jury.'" *Id.* at 597 n.4 (quoting *Apprendi*, 530 U.S. at 477 n.3). The

-53-

narrow holding of the Court in *Ring* is that because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," the Sixth Amendment requires that they be found by a jury. *Id.* at 609. Contrary to the defendant's assertions, *Ring* does not stand for the broad proposition that aggravating circumstances must be charged in the indictment to satisfy constitutional standards. . . . Therefore, *Ring* provides no relief to the defendant and does not invalidate this Court's holding in *Dellinger*.

*Daryl Keith Holton*, slip op. at 15.

From *Holton*, we can conclude with confidence that the petitioner's sentence of death is not infirm on the basis that the aggravating factor relied upon to support the death penalty was not charged in the indictment.

## B. *Ring v. Arizona*

The petitioner also relies on *Ring v. Arizona* to attack the harmless error analysis undertaken on direct appeal from his 1995 resentencing trial. In reviewing the jury instruction given on the (i)(5) aggravating circumstance during the 1995 trial, the Tennessee Supreme Court concluded that the trial court had erred in instructing on the 1989 version of the "especially heinous, atrocious or cruel" aggravator because the offense was committed in 1987, at which time a different articulation of the aggravating circumstance pertained.[9] *Cauthern*, 967 S.W.2d at 732-33; *see State v. Brimmer*, 876 S.W.2d 75, 82 (Tenn. 1994) (resentencing hearing must be conducted in accordance with law in effect at time of offense). The supreme court also concluded, however, that the error was harmless. *Cauthern*, 967 S.W.2d at 732-33.

The petitioner seeks to persuade that the supreme court's finding of harmless error under these circumstances is indistinguishable from the Arizona judge finding the existence of the aggravating factor in *Ring*. We disagree. We detect no indication in *Ring* that the Supreme Court was jettisoning appellate review predicated on a harmless-error analysis. In *Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827 (1999), the Supreme Court approved harmless-error review of the violation of the Sixth Amendment's jury-trial guarantee based upon an erroneous jury instruction that omitted an essential element of an offense. The *Neder* Court acknowledged that there is a limited group of errors that have been found to be "structural" and, therefore, beyond the scope of harmless-error review, such as the complete denial of counsel and trial before a biased judge. *Id.* at

---

[9] At the time of the offense, the aggravating circumstance set out in Code section 39-2-203(i)(5) provided that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(i)(5) (1982). In 1989, the statute was amended to provide as follows: "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." *Id.* § 39-13-204(i)(5) (1991).

8, 119 S. Ct. at 1833. Most constitutional errors, however, according to *Neder* can be harmless, including the omission of an element from a jury instruction. *Id.* at 8-9, 119 S. Ct. at 1833-34. In our opinion, *Neder* remains viable in the *Ring* context, which like *Neder*, was predicated on a Sixth Amendment violation of a defendant's right to trial by jury. Our conclusion is buttressed by the *Ring* Court's refusal to address the state's harmless-error argument, citing *Neder* for the proposition that the Supreme Court ordinarily leaves it to lower courts to pass on the harmlessness of error in the first instance. *Ring*, 536 U.S. at 609 n.7, 122 S. Ct. at 2443 n.7.

Neither *Apprendi* nor *Ring* afford the petitioner relief on his post-conviction complaints.

## VIENNA CONVENTION ON CONSULAR RELATIONS

As previously noted, the petitioner initiates a two-fold attack on his convictions related to the Vienna Convention on Consular Relations. First, he argues that Article 36 of the Vienna Convention creates judicially enforceable individual rights that, in his prosecution, were violated. Second, he claims that trial counsel's representation was constitutionally ineffective because he failed to investigate and discover the petitioner's German ancestry. The interaction, if any, between Article 36 of the Vienna Convention on Consular Relations and a state court criminal prosecution is a question of first impression in Tennessee.

We begin with a brief overview of the Vienna Convention on Consular Relations.

Prior to the adoption of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, 1969 WL 97928, the United States had entered into numerous treaties and international agreements with specific countries to address the conduct of consular relations and the performance of consular services. In 1963, however, the multilateral Vienna Convention on Consular Relations was finalized, whereupon countries began ratifying it. The Vienna Convention on Consular Relations entered into force for the United States on December 24, 1969. *Id.*, 1969 WL 97928.

The Vienna Convention on Consular Relations is comprised of 79 articles that provide a comprehensive set of rules for the operation of consulates and for the functions and obligations of consular officers. *Id.*, 1969 WL 97928. Article 36[10] of the treaty speaks to providing

---

[10] Article 36 reads in its entirety as follows:

§ Article 36. Communication and contact with nationals of the sending State

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

(a) consular officers shall be free to communicate with nationals of the sending

(continued...)

-55-

assistance to foreign nationals who are arrested or detained. Section 1.(b) of Article 36 provides that the authorities of a "receiving state" -- in this instance, the United States -- are, without delay, to inform any detained foreign national of his or her right to have the "consular post of the sending state" -- in this instance, Germany -- notified of his or her detention.[11] *Id.*, art. 36, 1969 WL 97928. Section 1.(c) specifies that "consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his [or her] legal representation." *Id.*, art. 36, 1969 WL 97928. *See generally* Ann K. Wooster, Annotation, *Construction and Application of Vienna Convention on Consular Relations (VCCR), Requiring That Foreign Consulate Be Notified When One of its Nationals Is Arrested*, 175 A.L.R. Fed. 243 (2002). The provisions of Article 36 have been implemented through federal regulations. *See* Notification of Consular Officers Upon the Arrest of Foreign Nationals, 28 C.F.R. § 50.5 (2004); Apprehension and Detention of Inadmissible and Deportable Aliens, 8 C.F.R. § 236.1(e) (2004).

In a situation involving a person who is a citizen of the United States and another country, the official position of the United States Department of State is that the person "may be

[10] (...continued)
> State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;
>
> (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;
>
> (c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.
>
> 2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

*Id.*, art. 36, 1969 WL 97928.

[11] "Mandatory notification" is required is some situations regardless whether the foreign national requests such notification. "Mandatory notification requirements arise from different bilateral agreements whose terms are not identical." U.S. Dep't of State, Pub. No. 10518, Consular Notification and Access 14 (1998). Germany is not a mandatory notification country. *See id.* at 5, 47-49.

treated exclusively as a U.S. citizen when in the United States [such that] consular notification is not required if the detainee is a U.S. citizen." U.S. Dep't of State, Pub. No. 10518, Consular Notification and Access 18 (1998).

Against this backdrop, the petitioner has asserted a violation of his rights guaranteed by the Vienna Convention on Consular Relations and has requested relief in the context of a state court proceeding for post-conviction relief. The threshold question that must be addressed is whether a violation of the subject treaty is cognizable in a post-conviction proceeding. As we shall explain, we do not believe that post-conviction relief can be predicated upon such a claimed violation.

The Post Conviction Procedure Act provides that relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2003). Through the Supremacy Clause of the United States Constitution, "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Nevertheless, it does not automatically follow that the Supremacy Clause converts violations of treaty provisions into violations of constitutional rights. As persuasively reasoned in *Murphy v. Netherland*, 116 F.3d 97 (4th Cir. 1997),

> Although states may have an obligation under the Supremacy Clause to comply with the provisions of the Vienna Convention, the Supremacy Clause does not convert violations of treaty provisions (regardless whether those provisions can be said to create individual rights) into violations of *constitutional* rights. Just as a state does not violate a constitutional right merely by violating a federal statute, it does not violate a constitutional right merely by violating a treaty. *See Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829) (stating that a treaty must "be regarded in courts of justice as equivalent to an act of the legislature").

*Id.* at 100 (emphasis in original); *see Whitney v. Robertson*, 124 U.S. 190, 194, 8 S. Ct. 456, 458 (1888) ("By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation."). Consequently, we are of the opinion that post-conviction relief does not reach a claimed violation of the Vienna Convention on Consular Relations.

Furthermore, we conclude that, for purposes of this post-conviction proceeding, Article 36 of the Vienna Convention on Consular Relations creates no individual rights that are privately enforceable. As a general proposition, but not invariably true, international treaties do not create rights that are privately enforceable. *See, e.g.*, *United States v. Emuegbunam*, 268 F.3d 377, 389-90 (6th Cir.) (collecting and discussing cases), *reh'g en banc denied* (2001). Because the consular-notification provision addresses the right of detained foreign nationals to have the consular post of the sending state notified of their detention, one arguable position is that Article 36 creates

individual rights. On the other hand, relevant portions of the preamble to the Vienna Convention, such as the following, support the view that no judicially enforceable rights are implicated: "The purpose of [the] privileges and immunities [set forth in the treaty] is not to benefit individuals but to ensure the efficient performance of functions by consular posts." Preamble to Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, 1969 WL 97928. Furthermore, the first paragraph of Article 36 specifically provides that the article is drafted "[w]ith a view to facilitating the exercise *of consular functions* relating to nationals of the sending State." *Id.*, art. 36, 1969 WL 97928 (emphasis added).

The United States Department of State adopts the view that the Vienna Convention creates state-to-state rights and obligations, not judicially enforceable individual rights. *See United States v. Li*, 206 F.3d 56, 63-64 (1st Cir.) (en banc), *cert. denied*, 531 U.S. 956, 121 S. Ct. 379 (2000). Substantial deference, it should be noted, is to be accorded the State Department's view in interpreting an international treaty. *See El Al Isr. Airlines v. Tsui Yuan Tseng*, 525 U.S. 155, 168, 119 S. Ct. 662, 671 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); *Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S. Ct. 922, 926 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight.").

As for the United States Supreme Court, in a *per curiam* order denying two related petitions for writ of certiorari, the Court in *Breard v. Greene*, 523 U.S. 371, 118 S. Ct. 1352 (1998), left open the issue whether the consular-notification provision creates any private rights. *Id.* at 376, 118 S. Ct. at 1355 (Court noted that Article 36 "arguably confers on an individual the right to consular assistance following arrest").[12]

_____

[12] Since *Breard*, the International Court of Justice ("ICJ"), the organ of the United Nations that settles legal disputes submitted to it by States in accordance with international law and renders advisory opinions on legal questions referred to it by duly authorized international organs and agencies, has examined two claims against the United States involving Article 36. In *Germany v. United States (LaGrand Case)*, 2001 I.C.J. 104 (June 27, 2001), http://www.icj-cij.org/icjwww/idocket/igus/ igusjudgment/igus_ijudgment_20010625.htm (as visited February 5, 2004), the ICJ held that "Article 36, paragraph 1, creates individual rights, which, by virtue of Article I of the Optional Protocol, may be invoked in this Court by the national State of the detained person." *Id.* at ¶ 77. *LaGrand* involved two German nationals who were brothers and who were arrested in Arizona on homicide charges, tried, convicted, and sentenced to death. During the pendency of the proceedings before the ICJ, one brother was executed.

Regarding whether the United States had violated its obligation to Germany, pursuant to paragraph 2 of Article 36, the ICJ ruled,

[T]he procedural default rule prevented counsel for the LaGrands to [sic] effectively challenge their convictions and sentences other than on United States constitutional grounds [, and it] prevented [the courts] from attaching any legal significance to the fact, *inter alia*, that the violation of the rights set forth in Article 36, paragraph 1, prevented Germany, in a timely fashion, from retaining private counsel for [the LaGrands] and otherwise assisting in their defence as provided for by the Convention. Under these circumstances, the procedural default rule had the effect of preventing "full effect [from being] given to the purposes for which the rights accorded

(continued...)

Given the lack of direction from the United States Supreme Court, we take our lead from the general principle that treaties are not presumed to create privately enforceable rights.

Even, however, if we were to hold that Article 36 creates individual rights, the petitioner's claim fails for additional reasons. First, the petitioner has waived his claim within the meaning of the Post-Conviction Procedure Act. The ground for relief that he pursues could have been, but was not, presented for determination in any of the prior proceedings concerning his case. *See* Tenn. Code Ann. § 40-30-106(g) (2003).

Second, the petitioner's nationality, at best, is dual; his father was a German national, but the petitioner was born in the United States. The State Department's official position, as we previously explained, is that a person, such as the petitioner, may be treated solely as a United States citizen, which would obviate any requirement of consular notification.

Last, the petitioner's claim fails for the additional reason that he has not demonstrated how any violation of the treaty prejudiced his trials or requires that his convictions and/or sentences be set aside. We note that in *Breard v. Greene*, the Supreme Court observed that even if a Vienna Convention claim was "properly raised and proven, it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." 523 U.S. at 377, 118 S. Ct. at 1355.

The petitioner's prejudice argument is rather slim. He insists that had the German consul been contacted, consular involvement would have "insured [sic] that Mr. Cauthern received

[12](...continued)
under this article are intended", and thus violated paragraph 2 of Article 36.

*Id*. at ¶ 91.

The petitioner in the case before us insists that the ICJ's decision in *LaGrand* authoritatively interprets Article 36 of the Vienna Convention and is binding on the courts in this state. On November 17, 2003, the United States Supreme Court denied a petition for writ of certiorari in the case of *Torres v. Mullin*, 540 U.S. ___, 124 S. Ct. 562 (2003), in which that same question was raised.

Osbalso Torres, a Mexican national, was convicted by an Oklahoma jury of first degree murder and sentenced to death. After exhausting his state avenues of relief, he filed a petition in federal court for *habeas corpus* relief, which was denied. The Tenth Circuit Court of Appeals affirmed. *Torres v. Mullin*, 317 F.3d 1145 (10th Cir. 2003).

In support of Torres' petition for writ of certiorari, Mexico had filed an *amicus curiae* brief with the Supreme Court pointing out that Mexico had instituted a case before the ICJ in which it was claiming, *inter alia*, that the United States, in convicting and sentencing 52 Mexican nationals (including Torres), had violated the Vienna Convention. Mexico asked the Supreme Court to defer consideration of Torres' petition until the ICJ decided that dispute. *See* 540 U.S. at ___, 124 S. Ct. at 563 (Breyer, J., dissenting from the denial of the petition for writ of certiorari). The public hearings in Mexico's case before the ICJ concluded December 19, 2003, and the case is presently under advisement by the ICJ. *Avena and Other Mexican Nationals (Mexico v. United States of America)*, 2003 I.C.J. 128, http:www.icj-cji.org/icjwww/ipresscom/ipress2003/ipress2003-45_mus_20031223.htm (as visited February 5, 2004).

the expert and investigative resources necessary for a fair trial." We regard the matter as highly speculative. The petitioner's expert, Bernd Kuebart, had to secure the permission of the German government to appear at the post-conviction proceeding. Mr. Kuebart explained that he was authorized to testify about a limited number of issues; what, if any, involvement or assistance that Germany would have actually provided to the petitioner was not among the permitted topics. Furthermore, the petitioner does not suggest that an official of the German consulate would have been in superior position to explain the petitioner's rights as a criminal defendant in the United States. Under the circumstances, we discern no principled basis to relieve the petitioner of any burden to show how prejudice flowed from a violation of the Vienna Convention.

For all the foregoing reasons, we hold that the petitioner's post-conviction claim predicated on a violation of the Vienna Convention on Consular Relations must fail.

Regarding the petitioner's complaint that trial counsel's representation was constitutionally ineffective because he failed to investigate and discover the petitioner's German ancestry, a different analysis is required. To secure post-conviction consideration, an ineffective assistance of counsel claim need not be predicated on an act or omission involving a separate constitutional right. As recognized in *Dean v. State*, 59 S.W.3d 663, 667 (Tenn. 2001),

> [T]he constitutional right to effective assistance of counsel under the
> United States and Tennessee Constitutions is a cognizable issue in
> post-conviction proceedings irrespective of whether counsel's alleged
> deficiency implicated a separate constitutional error, a statutory error,
> a jury instructional error, or any other type of error or deficient
> performance. A defendant has the constitutional right to the effective
> assistance of counsel without categorical restrictions.

Even so, the petitioner's complaint fares no better in the ineffective assistance context.

We are not prepared to endorse the position that trial counsel's services were constitutionally deficient. The petitioner has not demonstrated that "prevailing professional norms" in 1988 or 1995 included an intimate familiarity with the Vienna Convention on Consular Relations. More fundamentally, the petitioner's German nationality was by no means obvious and was unknown even to the petitioner at that time. We expect that the prevailing terrorist-influenced climate will, no doubt, help to publicize the provisions of the Vienna Convention and to familiarize both the legal and lay communities with the responsibilities under that treaty. We are not, however, convinced that trial counsel's failure in this case to ferret out the petitioner's German nationality -- which was not officially recognized by Germany until 2000 -- was objectively unreasonable.

Even if trial counsel's performance could be characterized as deficient, the petitioner cannot surmount the prejudice hurdle to establish ineffective assistance. As we understand this portion of the petitioner's argument, he is asserting that with an adequate investigation trial counsel would have discovered his German background and enlisted the assistance of the German consul.

For the same reasons detailed earlier, the specifics of consular involvement in the petitioner's defense is speculative, given the record before us. Additionally, if the petitioner is maintaining that a consular-sponsored defense would have generated the type of mitigation evidence that he produced during the post-conviction hearings, we remain unpersuaded that the evidentiary landscape would have been sufficiently altered to demonstrate prejudice.

In summary, we necessarily maintain focus on the conventional framework of post-conviction procedure and the delivery of constitutionally effective representation. Within that framework, we find no basis to grant post-conviction relief to the petitioner on these issues.

## WAIVED OR PREVIOUSLY DETERMINED ISSUES

As a separate appellate issue, the petitioner contends that the post-conviction court erroneously ruled that some of his claims had been previously determined and that other claims had been waived. Evidently, the petitioner is complaining about the post-conviction court's limitation on the claims that it was willing to consider and its determination that the petitioner had abandoned some issues.

The petitioner fails to identify on appeal those claims which are the subject of his complaint. Without more, we cannot adequately review this issue, and we decline to do so. *See* Tenn. R. App. P. 27(a)(7) (appellate brief shall contain argument setting forth contentions with respect to issues presented and reasons why contentions require appellate relief, with citations to authorities and appropriate references to the record); Tenn. R. Ct. Crim. App. 10(b) (issues not supported by argument, citation to authorities, or appropriate references to record will be treated as waived).

## CHALLENGES TO TENNESSEE'S SYSTEM OF CAPITAL PUNISHMENT

The petitioner raises a myriad of challenges to the constitutionality of Tennessee's system of capital punishment that he contends were not, but should have been, raised previously by former appellate counsel. We discern no need for a protracted discussion of the delivery of appellate services, because these challenges have been considered and rejected in other cases.

The petitioner's complaint that his death sentence must be reversed because it violates his "fundamental right to life," is contrary to settled precedent as reflected in *Nichols*, 90 S.W.3d at 604, *State v. Mann*, 959 S.W.2d 503, 536 (Tenn. 1997) (Appendix), and *State v. Bush*, 942 S.W.2d 489, 523 (Tenn. 1997).

The alleged capricious and arbitrary imposition of the death penalty in Tennessee, based on prosecutorial discretion and discriminatory infliction, was examined and dismissed most recently in *State v. Reid*, 91 S.W.3d 247, 312-13 (Tenn. 2002) (Appendix) (collecting and citing prior decisions).

The petitioner's argument that the death penalty is imposed capriciously and arbitrarily because no uniform standards or procedures are in place for jury selection that will ensure a candid exchange about potentially prejudicial topics was dismissed in *Reid*, 91 S.W.3d at 313, *State v. Austin*, 87 S.W.3d 447, 487 (Tenn. 2002) (Appendix), and *State v. Caughron*, 855 S.W.2d 526, 542 (Tenn. 1993).

The petitioner's argument that the death qualification process generates a "relatively prosecution-prone, guilt-prone jury" was rejected in *Austin*, 87 S.W.3d at 487, *Terry v. State*, 46 S.W.3d 147, 170 (Tenn. 2001) (Appendix), *State v. Cribbs*, 967 S.W.2d 773, 796 (Tenn. 1998) (Appendix), and *Teel*, 793 S.W.2d at 246.

The petitioner's argument that the death penalty is inflicted arbitrarily because defendants are not allowed to question jurors about "popularly-held misconceptions" was rejected in *State v. Morris*, 24 S.W.3d 788, 815 (Tenn. 2000) (Appendix), *State v. Brimmer*, 876 S.W.2d 75, 86-87 (Tenn. 1994), and *Cazes*, 875 S.W.2d 253, 268 (Tenn. 1994).

The petitioner's complaints that Tennessee's death penalty instructions (1) fail to advise jurors about the sentencing effect of a non-unanimous verdict, (2) require jurors to agree unanimously to a life verdict in violation of *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860 (1988), and (3) fail to inform the jurors that the ultimate determination is whether death is the appropriate penalty were rejected in *State v. McKinney,* 74 S.W.3d 291, 319 (Tenn. 2002) (Appendix), *Terry*, 46 S.W.3d at 170, *Brimmer*, 876 S.W.2d at 87, and *Cazes*, 875 S.W.2d at 268.

The petitioner's insistence that fairness should require that the defense have the final argument in the penalty phase of the trial was rejected in *Brimmer*, 876 S.W.2d at 87, *Cazes*, 875 S.W.2d at 269, *Smith*, 857 S.W.2d at 24, and *Caughron*, 855 S.W.2d at 542.

Based upon the above-cited decisions, the petitioner's constitutional challenges to Tennessee's death penalty statutes are rejected.

**PENALTY PHASE INSTRUCTIONS AND VERDICT FORM**

The petitioner's final issue is another dual attack couched both as independent constitutional violations and an ineffective assistance of counsel claims.

During the petitioner's 1995 resentencing trial, the court erroneously instructed the jury on the 1989 version of the (i)(5) "especially heinous, atrocious, or cruel" aggravator instead of the version that existed at the time of the offense in 1987. *See Cauthern*, 967 S.W.2d at 732. The supreme court reviewed the evidence at resentencing and held that the error was harmless based upon sufficient evidence to establish the "torture" factor under either version of the (i)(5) aggravator and upon sufficient evidence to establish the "depravity of mind" factor in the earlier version, had the jury been properly instructed. *Id.* at 732-33.

-62-

Another potential problem with the 1995 resentencing trial, lurking unidentified until the post-conviction hearings, relates to the verdict form provided to the jury. The verdict form recited that before the jury could impose the death penalty, it must find that the state had proven beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating circumstances; however, in terms of the state's initial burden to establish the existence of an aggravating circumstance, the form did not specify that the state was required to prove the aggravating circumstance "beyond a reasonable doubt."

The petitioner devotes one paragraph in his appellate brief to the verdict form in terms of asserting trial counsel's ineffectiveness in failing to object to it. The post-conviction court found that the petitioner had not adequately raised the issue but chose, at any rate, to address it. The court, thereafter, concluded that the petitioner had suffered no prejudice because (a) the trial court's instructions to the jury -- as opposed to the verdict form -- unequivocally and repeatedly recited that the state was required to prove the existence of the aggravating circumstance beyond a reasonable doubt, and (b) the verdict form for life imprisonment correctly directed the jury to impose a life sentence if it unanimously determined that no statutory aggravating circumstance had been proven by the state beyond a reasonable doubt. We discern no error in the post-conviction court's evaluation of the matter. *See State v. Davidson*, 121 S.W.3d 600, 619-20 (Tenn. 2003) (despite omission in verdict form of state's burden to prove aggravating circumstance beyond a reasonable doubt, jury was instructed on correct standards of proof, and verdict complied with controlling statutory provisions); *State v. Robert Faulkner*, No. W2001-02614-CCA-R3-DD, slip op. at 29 (Tenn. Crim. App., Jackson, Sept. 26, 2003) (Code section 39-13-204(g)(2)(A)(i) does not require that jury shall note on the verdict form that the aggravating circumstance(s) were found beyond a reasonable doubt); *State v. Timothy McKinney*, W1999-00844-CCA-R3-DD, slip op. at 7-8 (Tenn. Crim. App., Jackson, March 28, 2001) (trial court had provided jury with thorough instructions which clearly delineated state's burden of proving statutory aggravating circumstance beyond a reasonable doubt), *aff'd* 74 S.W.3d 291 (Tenn. 2002).

Turning to the actual jury instructions given at the 1995 resentencing trial, the petitioner complains that the trial court erred in failing to inform the jury of the result in the event it found that the aggravating circumstance had been proven beyond a reasonable doubt but did not conclude that the state had proven that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt. The petitioner also frames this matter as ineffective assistance of counsel based on trial counsel's failure to object to the instruction given.

The claimed instructional error was raised *sua sponte* by the post-conviction court after the hearings were concluded, and the court issued an order directing the parties to file their respective positions on the issue in writing. The post-conviction court ultimately concluded that although the jury instructions were erroneous, the petitioner was not entitled to relief.

The first basis for the post-conviction court's conclusion was waiver. As an independent claim of instructional deficiency, the court noted that the petitioner had failed to raise the issue during the 1995 resentencing trial or on appeal from that proceeding, thereby activating the

waiver provision of the Post-Conviction Procedure Act. *See* Tenn. Code Ann. § 40-30-106(g) (2003). The petitioner does not appear to contest this finding other than to note that his ineffective assistance of counsel claim reaches the instructional issue.

The second basis for the post-conviction court's conclusion was the petitioner's failure to raise or litigate the issue in the context of the post-conviction proceeding. The petitioner strenuously contests this finding. He argues that the "factual basis" of the issue plainly appears in the 1995 resentencing transcripts, and he directs our attention to various numbered issues and sub-parts appearing in one of the amended petitions that had been filed. Whether viewed as a factual finding or as an interpretation of allegations in the post-conviction pleadings, the post-conviction court's determination is accurate in our estimation. The written allegations are directed at broader issues challenging the constitutionality of Tennessee's capital punishment system. We have dealt with those issues earlier in this opinion.

At any rate, we note that the post-conviction court did proceed to address the merits of the instructional issue in terms of counsel's challenged ineffectiveness. As a result, the third basis for the post-conviction court's rejection of the issue was the petitioner's failure to demonstrate how he was prejudiced by trial counsel's failure to object, which failure the court did regard as deficient performance.

Neither the parties nor the post-conviction court has cited any cases in which this unusual fact pattern has arisen, and our research discloses no similar cases. It appears, therefore, that we are called upon to decide whether a properly instructed jury would have returned a life sentence for Mrs. Smith's homicide. We begin with the observation that a properly instructed jury would have been charged consistently with the law in effect at the time of the offense. *See Cauthern*, 967 S.W.2d at 731-32. The pre-1989 first degree murder sentencing statute, Tenn. Code Ann. § 39-2-203 (1982), only required the jury to determine whether any aggravating circumstances outweighed any mitigating circumstances and did not include the reasonable doubt provision. Pursuant to the 1989 amendments to Tennessee's capital sentencing statute, before a jury may sentence a defendant to death, it must find that the state "has proven *beyond a reasonable doubt* that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances." *Id*. § 39-13-204(g)(2)(B) (1991 & 2003) (emphasis added).

The law is settled that that the 1989 amendment, requiring the state to prove beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances law, was not constitutionally compelled. *See State v. Stephenson*, 878 S.W.2d 530, 556 (Tenn. 1994). It was legislative largess to provide the benefit of the highest standard of proof. *See id*. The petitioner received the benefit of this largess in 1995 when his jury was instructed that before it could return a sentence of death, it was required to find unanimously that the statutory aggravating circumstance had been proven beyond a reasonable doubt and that such circumstance had been proven to outweigh any mitigating circumstances beyond a reasonable doubt.

As a practical matter, given the situation in this case, it matters not whether we view the issue from the perspective of the pre-1989 first degree murder sentencing statute or the 1989 amendment thereto. The problem remains the same because the question does not change: Would a jury, instructed that it could return a sentence of death only if it unanimously found that two conditions were satisfied, be prejudicially confused as to the verdict it was permitted to return if only one of the conditions was satisfied? We think not.

First of all, by its verdict of life imprisonment for Mr. Smith's homicide, the jury expressed its judgment that the state had failed to prove beyond a reasonable doubt the existence of the (i)(5) aggravating circumstance; the jury, in other words, clearly understood that under those circumstances it was not allowed to set death as the appropriate punishment. In addition, the record of the 1995 resentencing trial discloses that the jury was instructed that in arriving at punishment it "shall consider" any mitigating circumstances, and the court thereafter listed eight such circumstances. We think it reasonable to conclude that jurors possess a fundamental understanding that mitigation signifies something that is *less* -- not *more* -- severe, serious, or painful; something, in other words, that weighs *against* -- not *in favor of* -- a sentence of death. Knowing that it was directed to consider any mitigating circumstances, the jury then was told that it could return a death sentence *only* if it unanimously found that the statutory aggravating circumstance had been proven beyond a reasonable doubt *and* that such circumstance had been proven to outweigh any mitigating circumstances beyond a reasonable doubt.

To be sure, the charge in this case was not ideal, and we do not commend or recommend its use. Furthermore, we are mindful that the petitioner had the right to have a correct and complete charge of the law given to the jury. *See*, *e.g.*, *Teel*, 793 S.W.2d at 249. Jury instructions, however, are to be read as a whole. *See Stephenson*, 878 S.W.2d at 555. We add to the considerations discussed above the fact that the charge in the petitioner's case was not internally inconsistent, which was one of the critical circumstances identified by the supreme court in *Stephenson*. The *Stephenson* court reversed the defendant's death sentence "because the trial court judge commingled the pre-1989 law with the 1989 amended statute and compounded the error by delivering to the jury a pre-1989 verdict form upon which to make their findings." *Id*. at 556.

Accordingly, we conclude that the petitioner has failed to demonstrate how he was prejudiced by trial counsel's failure to object to the instructions given, and we affirm the post-conviction court's determination.

## CONCLUSION

For the foregoing reasons, we conclude that the petitioner, Ronnie M. Cauthern, has not shown that he is entitled to relief from either his convictions or death sentence. Therefore, we affirm the post-conviction court's dismissal of his petition for post-conviction relief.

_____
JAMES CURWOOD WITT, JR., JUDGE